JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
CARL R. GREENE

### DEFENDANTS
JOHN F. STREET, JANNIE L. BLACKWELL, DEBRA L. BRADY, PATRICK J. EIDING, AND NELLIE W. REYNOLDS ■

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Philadelphia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Clifford E. Haines/Lauren A. Cates, Haines & Associates
1835 Market Street, Suite 2420, Phila., PA 19103 215-246-2200 ■

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability   ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander   ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine   **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability   ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability   ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury   ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations   **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare   ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment   ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☒ 440 Other Civil Rights   ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Section 1983
Brief description of cause:
Denial of his right to due process as guaranteed by the Fourth and Fourteenth Amendments

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
09/07/2010

SIGNATURE OF ATTORNEY OF RECORD
*Clifford E. Haines*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARL R. GREENE                             :
103 Surgeon General's Court                :
Philadelphia, PA 19146,                    :
                                           :
            *Plaintiff,*                   :
                                           :      Civil Action No.
v.                                         :
                                           :
JOHN F. STREET, CHAIRMAN,                  :
JANNIE L. BLACKWELL,                       :
DEBRA L. BRADY,                            :
PATRICK J. EIDING, and                     :
NELLIE W. REYNOLDS                         :
d/b/a                                      :
PHILADELPHIA HOUSING AUTHORITY             :
BOARD OF COMMISSIONERS                     :
12 South 23rd Street                       :
Philadelphia, PA 19103,                    :
                                           :
            *Defendants.*                  :

## COMPLAINT

1.      This action involves claims by Carl R. Greene, Executive Director of the

Philadelphia Housing Authority ("PHA"), (1) pursuant to 42 U.S.C. § 1983 for denial of his right

to due process as guaranteed by the Fourth and Fourteenth Amendments to the United States

Constitution and (2) pursuant to state law for breach of contract by the PHA and its Board of

Commissioners.  Fueled by a barrage of media coverage, some of which was completely

unrelated to Mr. Greene's employment with PHA, the Board placed Mr. Greene on

"administrative leave," effectively terminating his position at PHA without affording him

meaningful due process and in violation of the terms of his Employment Agreement.

## JURISDICTION AND VENUE

2.     This court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.     Venue is proper under 28 U.S.C. §1391(b) because the events giving rise to the claim occurred in the City of Philadelphia, which is in the Eastern District of Pennsylvania.

## PARTIES

4.     Plaintiff Carl R. Greene is an adult individual residing at 103 Surgeon General's Court, Philadelphia, PA 19146.

5.     At all relevant times, Mr. Greene served as Executive Director of the Philadelphia Housing Authority.

6.     The PHA Board of Commissioners is the governing body of the PHA, and is charged with overseeing the operation of the PHA.  Its headquarters are at 12 South 23rd Street, Philadelphia, PA 19103.

7.     Defendant John F. Street is Chairman of the PHA Board of Commissioners, and at all relevant times acted in his capacity as such and under color of state law.

8.     Defendant Jannie L. Blackwell is a member of the PHA Board of Commissioners, and at all relevant acted in her capacity as such and under color of state law.

9.     Defendant Debra L. Brady is a member of the PHA Board of Commissioners, and at all relevant acted in her capacity as such and under color of state law.

10.     Defendant Patrick J. Eiding is a member of the PHA Board of Commissioners, and at all relevant acted in his capacity as such and under color of state law.

11.    Defendants Nellie W. Reynolds is a member of PHA Board of Commissioners, and at all relevant acted in her capacity as such and under color of state law.

## FACTS

12.    On March 3, 1998, Mr. Greene became the Executive Director of the PHA.

13.    At that time, Philadelphia had one of the worst housing authorities in the United States.  Mr. Greene brought a wealth of knowledge and experience to his position and completely transformed the PHA into an industry leader.

14.    On March 29, 2007, John F. Street, Chairman of the PHA Board, signed an Employment Agreement with Mr. Greene providing for his employment as the Housing Authority's Executive Director and permitting termination only under limited circumstances. *See* Employment Agreement, attached as Exhibit A.

15.    In that Agreement, Chairman Street cited Mr. Greene's expert leadership and unprecedented success as PHA's Executive Director: "Mr. Greene has consistently lead and managed the PHA in an expert fashion, achieved the goals and objectives of the PHA [Strategic Operating Plan], helped to positively transform large areas of Philadelphia, and emerged as a national leader and authority on affordable housing issues." Ex. A.

16.    Under the terms of the Employment Agreement, Mr. Greene was to receive base compensation of $275,000 per year, annual incentive compensation of 15% of the base salary, and cost of living adjustments. Ex. A, ¶ 2.

17.    The Agreement also provides that Mr. Greene would receive full employee benefits. Ex. A, ¶ 4.

18.    The Agreement can be terminated "for cause," which is defined in the Agreement to be "only" as follows:

3

a.    "A material act or acts of dishonesty on Mr. Greene's part, which is criminal in nature, intended to result directly or indirectly to Mr. Greene's substantial gain or personal enrichment at PHA's expense, and which results in demonstrable material injury and damage to PHA," Ex. A, ¶ 8(a)(i);

b.    "Mr. Greene's willful and intentional conduct, recklessness, gross negligence and failure to substantially perform his duties [under the Agreement], other than a failure resulting from Mr. Greene's incapacity or illness, if Mr. Greene's willful and intentional misconduct, recklessness, gross negligence and failure results in demonstrable material injury and damage to PHA," Ex. A, ¶ 8(a)(ii); or

c.    "Lack of funding," Ex. A, 8(a)(iii).

19.    The Agreement can be terminated by either party without cause only upon 90 days notice, or for disability or death. Ex. A, ¶ 8(c)-(e).

20.    In August of 2010, Chairman Street held the belief that the PHA was a national model of a well-run and highly successful public housing authority, perhaps the best in the nation. Street's view was shared by public officials and political leaders throughout the country. Moreover, many public housing tenants believed that Mr. Greene transformed their quality of life by providing affordable, safe, quality public housing.

21.    Despite these facts, Mayor Street began an orchestrated plan – spawned by media attention – to remove Mr. Greene from his post, deprive him of his position and reputation, and terminate the contract Mr. Greene enjoys with the PHA.

22.     The pretext for the Board's actions is a series of allegations reported in the newspapers, on television broadcasts, and on the radio that reflect a mob-like frenzy, which the Board both fueled and fed on. The allegations are threefold.

23.     First, Mr. Greene was sued by the bank holding a mortgage on his home because he failed to make timely payments. This allegation first appeared in an August 13, 2010 *Daily News* article titled "PHA boss has his own housing problems," reporting that Wells Fargo had started foreclosure proceedings against Mr. Greene. Attached as Ex. B.

24.     Second, Mr. Greene was subject to federal tax liens, which have since been cured. This allegation appeared in news stories published by both the *Daily News* and *The Philadelphia Inquirer* on August 14, 2010. PHA Board Member Nellie Reynolds is quoted in the *Daily News* as stating, "There is something wrong with the picture ... That's just really crazy ... That makes me jittery." Attached as Ex. C. To further fuel the media frenzy, *The Philadelphia Inquirer* article also reported details from a short-lived 2008 lawsuit by a former PHA employee accusing Mr. Greene of wrongful termination (after one week on the job) and defamation. Even though the lawsuit ultimately went nowhere, the *Inquirer* article reported details of the complaint, including accusations that Mr. Greene was hiding legal fees spent on "illegitimate cases." Attached as Ex. D.

25.     Third, a number of former employees at PHA have reportedly made sexual harassment claims directed at Mr. Greene. On August 18, 2010, the *Daily News* reported that PHA employee Elizabeth Helm had filed a sexual harassment claim against Mr. Greene. Attached as Ex. E. The following day, on August 19, 2010, *The Philadelphia Inquirer* ran a more detailed story about Helm's allegations, this time citing salacious and outlandish statements by Helm's counsel, John Elliott. Attached as Exhibit F. Over the next few days, the press

continued to capitalize on the story, publishing a series of articles identifying three additional sexual harassment claims dating back to 2004, all of which were settled by PHA's insurer.

26.     The first two allegations have no bearing on PHA or its operations. The third, while related to PHA, constitute claims affecting four disgruntled former employees out of thousands of PHA workers.

27.     Even assuming these allegations could be proven true (which they cannot), they cannot form the basis for terminating Mr. Greene.

28.     Mr. Greene's termination can only be effectuated upon wrongful acts that result in "demonstrable injury and damage to PHA."

29.     The allegations of sexual harassment have in no way caused "demonstrable injury and damage to PHA." Rather, they were settled by PHA's insurer with the benefit of counsel. Until the recent media circus, Mr. Greene continued to be hailed as PHA's shrewd and capable leader.

30.     On August 25, 2010, Mayor Street – through *The Philadelphia Inquirer* – stated, "I think the sexual-harassment cases really change everything" in response to the question of whether Mr. Greene should be removed from his position as PHA's Executive Director. Attached as Ex. G.

31.     The PHA Board held a meeting on August 26, 2010 to address the media-driven sexual harassment allegations against Mr. Greene.

32.     At this meeting, the Board adopted a Resolution to place Mr. Greene on "administrative leave" pending the results of an investigation into the allegations of sexual harassment. *See* Resolution No. 1, attached as Ex. H.

33.     The Resolution states: "the Board has recently been made aware of certain serious allegations made against the Executive Director with respect to his professional conduct." The Board was "made aware" only after newspaper publications, television broadcasts, and radio reports of stories over a two-week period that gave the Board and its Chairman an opportunity to remove Mr. Greene from his post at PHA. Ex. H.

34.     Therefore, on the heels of this media-driven frenzy, the Board purported to undertake an "immediate, thorough and independent investigation," with the goal to "complete the investigation and make recommendations for corrective action within 30 days." Ex. H.

35.     The Resolution prohibits Mr. Greene from reporting to work, contacting or directing any PHA employees, or accessing any PHA systems during the pendency of this "investigation." Ex. H.

36.     The Board further resolved that Chairman Street is responsible for conducting the investigation, and reporting its results to the Board. Ex. H.

37.     At this meeting, Board members professed that the investigation would ensure that Mr. Greene would receive "due process" rather than be tried in the press.

38.     This profession, however, lacked teeth as the Board was made aware both before and during the meeting that Mr. Greene was unavailable because he was undergoing medical diagnosis and treatment at a facility outside of Pennsylvania. *See* Letter from Clifford E. Haines, Esq. to Honorable John Street, Aug. 24, 2010, attached as Ex. I.

39.     Nonetheless, the Board called for this 30-day investigation at a time when it knew Mr. Greene was unavailable to participate and respond to these allegations on his own behalf.

40.     At the meeting, the Board distributed extensive materials to the press purportedly including:  PHA's Bylaws and Procurement Policy; Mr. Greene's March 29, 2007 Employment

7

Agreement; a "Primer on Sexual Harassment" that is of unknown origin; John Elliot's April 21, 2010 letter to the Board on behalf of Elizabeth Helm, which the Board members did not even recall seeing until the press raised the issue; various letters to the Board commenting on the allegations in the newspapers; a document titled "Questions and Answers" regarding Mr. Greene's Employment Agreement, also of unknown origin; and a compilation of the news stories that fueled the Board's decision to investigate and place Mr. Greene on "administrative leave."

41.     At the meeting, Chairman Street proclaimed "if he sexually harassed one woman on his staff, he's gone," and opined – erroneously – "I think sexual harassment is misconduct" and can be grounds for termination under the Agreement.

42.     This "investigation" and "administrative leave" period are pretext for Mr. Greene's termination.

43.     By placing Mr. Greene on "administrative leave," the Board – in effect – terminated Mr. Greene without cause and in violation of the terms of his Employment Agreement.

44.     To date, the Board has been unable to identify the person/agency conducting the "investigation" into these allegations, despite requests from Mr. Greene's counsel. Nor has the Board attempted to provide any information to Mr. Greene's counsel or to seek any information from Mr. Greene.

45.     The Board has, however, continued to speak with members of the press regarding the allegations, including a recent report by Chairman Street that two unnamed PHA employees claim to have been sexually harassed by Mr. Greene and who, according to Street, have not and do not intend to file formal complaints against Mr. Greene. Attached as Ex. J.

46. The Board's actions to "investigate" Mr. Greene and place him on "administrative leave" at a time when he is unavailable to respond to the claims against him violated Mr. Greene's right to due process and constitute a breach of the Employment Agreement between Mr. Greene and the Board.

47. As a result of the actions of the Board and Chairman Street, Mr. Greene has suffered harm, including loss of his position as Executive Director of the PHA, damage to his professional reputation, embarrassment, and humiliation.

## COUNT I – DENIAL OF PROCEDURAL DUE PROCESS

48. Plaintiff incorporates paragraphs 1 – 47 as if fully set forth in this count.

49. Mr. Greene has a property interest in his continued employment as Executive director of the PHA under the terms of his Employment Agreement.

50. As an employee who could be terminated "for cause," Mr. Greene is entitled to due process, which includes notice and an opportunity to be heard as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

51. Chairman Street has indicated, through statements to the press, that the Board intends to terminate Mr. Greene if this so-called "investigation" reveals that "one woman" was sexually harassed. But, the results of this investigation appear to be predetermined.

52. At the time the Board and Chairman Street resolved to "investigate" Mr. Greene based on allegations in the press, they were fully aware that Mr. Greene was undergoing medical diagnosis and treatment outside of Pennsylvania and would not be available to participate in the "investigation" in any meaningful way.

53. By resolving to conduct an investigation – which Chairman Street indicated will lead to Mr. Greene's termination, and which termination in effect occurred when the Board

placed Mr. Greene on "administrative leave" – while Mr. Greene is undergoing medical

diagnosis and treatment and is unavailable to defend himself, the Board engaged in conduct that

has, and will continue to, deprive Mr. Greene of his right to procedural due process as

guaranteed by the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Carl R. Greene demands judgment in his favor and against PHA

for a sum in excess of $75,000 in compensatory and punitive damages together with lawful

interests and costs, and attorney's fees and costs pursuant to 42 U.S.C. §1988.

## COUNT II – BREACH OF CONTRACT

54.     Plaintiff incorporates paragraphs 1 – 53 as if fully set forth in this count.

55.     Mr. Greene and PHA entered into an Employment Agreement on March 29, 2007.

56.     Mr. Greene has fully complied with conditions of his Employment Agreement.

57.     Mr. Greene's termination can only be effectuated upon wrongful acts that result in

"demonstrable material injury and damage to PHA."

58.     PHA breached its Employment Agreement with Mr. Greene by placing him on

"administrative leave" – which in effect terminated his employment and removed him as

Executive Director of the PHA – and prohibiting him from contacting any PHA employees or

accessing PHA's systems.

59.     No one has claimed that the allegations the Board purports to be "investigating"

rise to the level of "demonstrable material injury and damage to PHA."

60.     Therefore, the Board and Chairman Street's actions are in direct violation of the

terms of Mr. Greene's Employment Agreement with PHA.

61.    As a direct and proximate result of the Board's breach of the Employment

Agreement, Mr. Greene has suffered harm, including loss of his position as Executive Director

of PHA without cause.

WHEREFORE, Plaintiff Carl R. Greene demands judgment in his favor and against PHA

for a sum in excess of $75,000 in compensatory damages together with lawful interests and

costs.

Respectfully submitted,

*Clifford E. Haines*

CLIFFORD E. HAINES, ESQ., PA ID 09882
LAUREN A. CATES, ESQ., PA ID 200620
*Attorneys for Plaintiff*
Haines & Associates
1835 Market Street
Suite 2420
Philadelphia, Pennsylvania 19103
215-246-2200 Phone
215-246-2211 Fax

September 7, 2010

# EXHIBIT A

**EMPLOYMENT AGREEMENT**

This employment agreement (the "Agreement") is made this 29th day of March, 2007, by and between the PHILADELPHIA HOUSING AUTHORITY, a public body, corporate and politic, created and organized in accordance with the Housing Authorities Law, 35 P.S. § 1541 et seq. (Act of May 28, 1937, P.L. 995, Section 1), as amended ("PHA"), and Carl R. Greene, an individual residing at 1420 Locust Street, Philadelphia, PA 19103 ("MR. GREENE").

**BACKGROUND**

WHEREAS, MR. GREENE is currently employed by PHA as Executive Director of PHA pursuant to the terms of an employment agreement between MR. GREENE and PHA authorized by Resolution No.10616 of the PHA Board of Commissioners (the "2000 Agreement") and subsequently amended by the Board of Commissioners in November 2004.

WHEREAS, in his capacity as Executive Director of PHA, MR. GREENE is charged with leading and managing PHA to achieve those certain goals and objectives set forth in PHA's Strategic Operating Plan ("SOP"),

WHEREAS, since his arrival at PHA in April 1998, MR. GREENE has consistently lead and managed PHA in an expert fashion, achieved the goals and objectives of the PHA SOP, helped to positively transform large areas of Philadelphia, and emerged as a national leader and authority on affordable housing issues;

WHEREAS, due to MR. GREENE'S expert leadership, unprecedented success, and national standing, PHA wishes to continue to employ MR. GREENE; and

WHEREAS, MR. GREENE desires to continue to be employed by PHA on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants, conditions and agreements herein contained, the parties hereto, intending to be legally bound, hereby agree as follows:

1.        EMPLOYMENT.  PHA shall retain MR. GREENE to serve as Executive Director of PHA and lead PHA in the accomplishing the goals and objectives of the PHA's SOP.

2.        COMPENSATION.  MR. GREENE and PHA agree that during his employment by PHA, MR. GREENE shall receive the following compensation:

(a)        A Base Salary of TWO HUNDRED SEVENTY FIVE THOUSAND DOLLARS ($275,000) per annum, which amount shall be paid in weekly installments;

(b)        Annual incentive compensation equal to Fifteen Percent (15%) of MR. GREENE'S base salary if specific performance goals for MR. GREENE are achieved; and

(c)       Cost of living adjustments ("COLA") to the extent PHA provided COLA adjustments to the compensation packages of PHA senior management level employees.

3.       CHANGES IN RATE OF COMPENSATION.   As compensation for services rendered under this Agreement, MR. GREENE may be entitled to additional increases in his Base Salary provided in Section 2(a) at the sole discretion of the PHA Board of Commissioners (the "BOARD").

4.       BENEFITS.  MR. GREENE and PHA agree that during the term of the Agreement, MR. GREENE shall receive the following benefits:

(a)       Full medical and dental benefits;

(b)       Life insurance and long term disability insurance;

(c)       Participation in PHA's pension plan, which allows withdrawal of contributions to another plan upon termination of employment;

(d)       Eleven (11) paid holidays annually;

(e)       Six weeks paid vacation annually; and

(f)       Full use of a PHA automobile with the assistance of a PHA driver when using the car for PHA business.

(g)       Any and all other benefits as set forth in PHA's Human Resources Policy.

5.       FULL TIME EMPLOYMENT.  MR. GREENE and PHA agree than MR. GREENE's employment as Executive Director shall constitute MR. GREENE'S primary employment, and that MR. GREENE shall not engage in any activity that conflicts in any way with the performance of his responsibilities as Executive Director.

6.       NON-DISCLOSURE.  MR. GREENE recognizes and acknowledges that he will have access to or otherwise learn about certain confidential information, records and other proprietary commercial information of PHA (collectively, the "Confidential Information"). MR. GREENE agrees that he will not, during the term of this Agreement and for one year following the termination of this Agreement, use or disclose any such Confidential Information to any party without express written authorization of the BOARD.  MR. GREENE shall not, however, be prevented from disclosing Confidential Information pursuant to court order or other legal process and MR. GREENE shall not be prevented from using or disclosing Confidential Information that:

(a)       MR. GREENE can demonstrate by written records was known to him before the date of disclosure hereunder; or

(b)       Is now, or becomes in the future, publicly available other than by breach of this Agreement by MR. GREENE; or

(c)      Is lawfully disclosed to MR. GREENE on a non-confidential basis by a third party who is not obligated to PHA to retain such Confidential Information in confidence; or

(d)      That is subsequently developed by MR. GREENE independent of the Confidential Information received hereunder.

7.      POST-EMPLOYMENT RESTRICTIONS.   MR. GREENE agrees to comply with all United States Department of Housing and Urban Development ("HUD"), Commonwealth of Pennsylvania and other applicable post-employment restrictions as set forth in the Consolidated Annual Contribution Contract between the United States, acting by and through HUD, and the PHA; conflict of interest and other applicable regulations promulgated by HUD and other federal funding sources; and the Public Official and Employees Ethics Law, 65 P.S. § 401, et seq. in general, and 65 P.S. § 403(g), in particular.

8.      TERMINATION.

(a)      Termination by PHA for Cause.   This Agreement may be terminated immediately for cause upon written notice to MR. GREENE to such effect.  Cause as used in this Section is defined to mean only:

(i)      A material act or acts of dishonesty on MR. GREENE'S part, which is criminal in nature, intended to result directly or indirectly to MR. GREENE'S substantial gain or personal enrichment at PHA'S expense, and which results in demonstrable material injury and damage to PHA;

(ii)      MR. GREENE'S willful and intentional misconduct, recklessness, gross negligence and failure to substantially perform his duties hereunder, other than a failure resulting from MR. GREENE'S incapacity or illness, if MR. GREENE'S willful and intentional misconduct, recklessness, gross negligence and failure results in demonstrable material injury and damage to PHA; or

(iii)      Lack of funding.

(b)      Termination by Mr. Greene for Good Cause.   This Agreement may be terminated by MR. GREENE upon thirty (30) days written notice to PHA after the occurrence of any of the following events, each of which shall constitute "good reason" for termination, unless otherwise agreed to in writing by MR. GREENE:

(i)      A material diminution occurs in the duties or responsibilities of MR. GREENE (e.g., MR. GREENE is placed in a reporting relationship to anyone other than the BOARD) and such diminution is not cured within fifteen (15) days after written notice of the same is received by PHA;

(ii)      PHA fails to pay compensation as required hereunder and such failure is not cured within fifteen (15) days after written notice of the same is received by PHA;

(iii)     MR. GREENE is removed from the position of Executive Director of PHA; or

(iv)     a liquidation or dissolution of PHA occurs.

Nothing contained herein under this article shall be construed to relieve PHA from fulfilling its obligations, financial or otherwise, to MR. GREENE.

(c)     <u>Termination Without Cause</u>.  Either party to this Agreement may terminate the Agreement without cause, but only upon ninety (90) days' notice to the other party.

(d)     <u>Disability</u>.  If MR. GREENE is absent from his employment by reason of illness or incapacity for a continuous period of ninety (90) calendar days, or any other longer time period that is required by applicable law, PHA may terminate this Agreement upon thirty (30) days' written notice to MR. GREENE.

(e)     <u>Death</u>.  If MR. GREENE dies during the term of this Agreement, this Agreement and all obligations of PHA shall immediately cease as of such date except such obligations, if any, that survive death.

9.     <u>TERMINATION BENEFITS</u>.

(a)     In the event MR. GREENE terminates the Agreement under Section 8(b), or PHA terminates the Agreement under Section 8(c), PHA shall pay MR. GREENE for twenty-four (24) months worth of the base salary and benefits set forth in paragraphs 2 through 5 of this Agreement.  PHA will also provide MR. GREENE with any vested or accrued benefits to which he would otherwise be entitled.  It is understood and agreed that in the event MR. GREENE applies for and receives unemployment compensation, the amount of severance due to MR. GREENE shall be reduced on a dollar-for-dollar basis by the amount of unemployment compensation received by MR. GREENE.  Such severance pay shall not be reduced, however, by any compensation MR. GREENE receives from other sources, including employment by another Employer after termination.

(b)     In the event MR. GREENE terminates the Agreement under the provisions of Section 8(c) of this Agreement, PHA terminates the Agreement under the provisions of Section 8(a) of this Agreement, or MR. GREENE ceases to be an employee of PHA because of events described in Sections 8(d) and 8(e) of this Agreement, PHA shall compensate MR. GREENE only for the period until and including the date of termination, computed pro rata up to and including that date.  PHA will also provide MR. GREENE with any vested or accrued benefits to which he would otherwise be entitled.  In the event MR. GREENE ceases to be employed by PHA because of an event described in Section 8(d), PHA shall also pay any expenses MR. GREENE incurs as a result of MR. GREENE'S exercise of his rights under the Consolidated Omnibus Budge Reconciliation Act (COBRA).

(c)     <u>No Other Claims</u>.  The acceptance by MR. GREENE of severance pay and continuation of benefits as provided in this Paragraph 9 is in compensation for all claims arising under this Agreement, as well as counsel fees and costs; provided, however, and notwithstanding the foregoing, MR. GREENE shall retain all rights MR. GREENE may have

4

under law to make claims: (i) for unemployment compensation; (ii) to enforce any pension rights he may have or receive; (iii) to enforce such rights as he may have under COBRA; (iv) under the Workmen's Compensation Law; (v) under federal, state and local employment discrimination laws; (vi) for intentionally tortuous conduct, or (vii) to enforce the provisions of this Agreement.

10.      **INSURANCE AND INDEMNITY**  PHA shall, to the extent permitted by law and its by-laws, indemnify MR. GREENE in connection with his employment status as set forth herein. PHA shall also provide MR. GREENE with coverage as a named insured under any directors and officers liability insurance policy maintained for PHA's directors and officers, and PHA shall continue to maintain directors and officers liability insurance for the benefit MR. GREENE during the term of this Agreement and subsequent to the termination of MR. GREENE'S employment with PHA, and will also cover any deductibles under said policies. This obligation shall survive expiration or termination of this Agreement with respect to proceedings or threatened proceedings based on acts or omissions of MR. GREENE occurring during MR. GREENE'S employment with PHA. Such obligations shall be binding upon PHA'S successors and assigns and shall inure to the benefit of MR. GREENE'S heirs and personal representatives.

11.      **RETURN OF PROPERTY**.   Upon termination or expiration of this Agreement, regardless of when or how termination may be affected, MR. GREENE shall immediately return to PHA all property of PHA, and PHA shall return to MR. GREENE all property of MR. GREENE.

12.      **PRIOR EMPLOYMENT**. MR. GREENE represents and warrants that he is not a party to any other employment, non-competition or other agreement or restriction which could interfere with his employment with PHA, or his or PHA's rights and obligations hereunder; and that his acceptance of employment with PHA under this Agreement and the performance of his duties hereunder will not breach the provisions of any contract or agreement to which he is a party.

13.      **ENFORCEABILITY**.  If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, then such provision(s) shall be deemed to be modified or restricted to the extent and in any manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

14.      **PENNSYLVANIA JURISDICTION AND LAW**.  This Agreement shall be governed by and all questions relating to its validity, interpretation, enforcement and performance (including, without limitation, provisions concerning limitations of actions) shall be construed in accordance with the laws of the Commonwealth of Pennsylvania.  The parties hereto consent to the jurisdiction of the courts of the Commonwealth of Pennsylvania and/or the United States District Court for the Eastern District of Pennsylvania as the exclusive courts of jurisdiction with respect to the interpretation or enforcement of the provisions of this Agreement. This Agreement shall be construed without the aid of any canon, custom or rule of law required in construction against the draftsman.

15.        SUCCESSORS AND ASSIGNS.   This Agreement shall inure to the benefit of, and be binding upon, the heirs, successors, administrators, successors and assigns of the respective parties hereto, but in no event may MR. GREENE assign or delegate to any other party his rights, duties or obligations under this Agreement.

16.        WAIVERS.  No claim or right arising out of a breach or default under this Agreement shall be discharged in whole or in part by a waiver of that claim or right unless the waiver is supported by consideration and is in writing and executed by the aggrieved party hereto or his or her duly authorized agent.

17.        COUNTERPARTS.  This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

18.        HEADINGS.  Paragraph and section headings herein shall have absolutely no legal significance and are used solely for convenience or reference.

19.        DAYS.  Any references to a number of days in this Agreement shall mean "calendar days," unless business days are specified.

20.        NOTICES.   Any notice required or permitted to be given under this Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by telegram or facsimile, or sent by registered or certified United States mail, return receipt requested, addressed as follows, or to such other or additional addresses as the parties may from time to time request:

IF TO PHA:

> The Honorable John F. Street
> Chairman of the Board of Commissioners
> Philadelphia Housing Authority
> 12 South 23rd Street, 6th Floor
> Philadelphia, PA  19103

IF TO MR. GREENE:

> Mr. Carl R. Greene
> Academy House
> 1420 Locust Street, Apt. 12I
> Philadelphia, PA  19103

21.        EFFECTIVE DATE; TERMINATION OF 2000 AGREEMENT.

(a)        This Agreement shall become effective upon approval of the Agreement by resolution of the PHA Board of Commissioners (the "Effective Date").

(b)        Upon approval of this Agreement by resolution of the PHA Board of Commissioners, the parties agree that the Parties' 2000 Agreement shall be mutually

terminated, and its provisions rendered null and void, and that this Agreement alone shall govern the relationship of the parties.

      22.            **TERM**.  The term of this Agreement shall run for a period of five (5) years from the Effective Date.

      23.            **ENTIRE AGREEMENT AND MODIFICATIONS**.  This Agreement contains the entire agreement of the parties and no promises or representations were made or relied upon by either party other than those expressly set forth herein.  This Agreement supersedes any and all other employment arrangements or agreements between the parties.  The Agreement may only be amended in writing signed by both parties.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the day and year first above written.

PHILADELPHIA HOUSING AUTHORITY

[Corporate Seal]                BY: _____

Name:  John F. Street
Title:   Chairman of the Board

WITNESS:

_____        CARL R. GREENE

                                      _____

# EXHIBIT B

# PHILADELPHIA DAILY NEWS

THE PEOPLE PAPER

AN EDITION OF The Philadelphia Inquirer

## PHA CHIEF'S MORTGAGE WOES

PAGE 5

# PHA boss has his own housing problems

**By CATHERINE LUCEY**
luceyc@phillynews.com
215-854-4172

The head of the Philadelphia Housing Authority is having difficulty paying his mortgage.

According to court documents, Wells Fargo Bank has started foreclosure proceedings against Carl R. Greene, PHA executive director, over his pricey Naval Square condo.

Greene's salary this year was $306,870, with a bonus of $44,188. He bought the 2,100-square foot condo in the Naval Square development in 2007 for $615,085, according to city records.

Greene was unavailable for comment last night, but PHA spokesman Kirk Dorn confirmed that Greene is having housing problems.

"Mr. Greene is involved in a dispute with his mortgage company," Dorn said. "It's unfortunate that the dispute is now public. But he plans to deal with the matter in private."

Wells Fargo is represented by Phelan, Hallinan & Schmieg, a Center City law firm that specializes in representing mortgage bankers in Pennsylvania and New Jersey. No one at the firm could be reached last night.

Greene is scheduled to have a conciliation conference Sept. 16 to try to resolve the mortgage issues in a City Hall courtroom, according to court listings. The city's mortgage-foreclosure program requires lenders to attempt to negotiate with homeowners before a foreclosed property can go to sheriff's sale.

Greene has served since 1998 as executive director of PHA, a public, federally funded housing agency. He has torn down high-rises and built housing that fits into the city's rowhouse neighborhoods.

Before coming to Philadelphia, Greene served as executive director of the Detroit Housing Commission, and before that he held management positions with the housing authorities in Washington and Atlanta.

Greene's residence is off Grays Ferry Avenue in the city's Schuylkill section, at the Naval Square complex. It's a gated community developed by



Greene

Toll Brothers at the site of the early-19th-century Naval Home, designed in 1826 by architect William Strickland. It was the first home of the nation's first retirement home for sailors and marines. The site, a National Historic Landmark, includes former residences of the governor and the surgeon general.

Homeowners at the complex, according to its Web site, "will enjoy access to a full roster of amenities including sprawling 20-acre parade grounds and the community center located in the soaring rotunda of Biddle Hall, the community's flagship building." ★

*Staff writer Wendy Ruderman contributed to this report.*

# EXHIBIT C

# PHA boss also plagued with tax woes

## One commish 'jittery' after Greene settles big bill with IRS

By CATHERINE LUCEY
& WENDY RUDERMAN
lucey@phillynews.com
215-854-4172

Philadelphia Housing Authority chief Carl R. Greene's money problems go much deeper than his unpaid mortgage.

Greene settled a tab with the Internal Revenue Service in December after the agency slapped him with a lien for $52,480 in unpaid federal taxes dating back to 2002.

Attempts to reach Greene yesterday were unsuccessful and a spokesman did not provide a response to questions about the tax lien.

But one PHA commissioner raised questions about why Greene — who makes $306,370 as PHA executive director — is facing foreclosure on his Naval Square complex condo and having difficulty keeping up with federal tax payments.

"There is something wrong with the picture," PHA Commissioner Nellie Reynolds said yesterday. "That's just really crazy. That makes me jittery."

Greene bought his condo for $615,036 in 2007. According to financial records, Greene took out a $400,000 mortgage to buy the 2,100-square-foot home in southwest Center City.

Based on the civil suit filed by



Carl Greene

PHA executive director Carl Greene is having trouble paying for his Naval Square condo (center unit).

Wells Fargo Bank, Greene stopped paying his mortgage in April. In June, he was notified that he was past due by $7,550. Then in July, the bank sued Greene, saying he owed $886,685, which is the principal balance plus interest, late charges and other fees.

Breaking all those numbers down, this means that Greene, who makes $25,630 a month before taxes, stopped paying his $2,481 mortgage bill.

Reynolds, a PHA board member off and on for more than two decades, said she intends to ask Greene about the delinquent tax payments because she wants to make sure his troubles aren't impacting or connected to PHA business.

"There might not be any real concern," she said. "It depends on what it is. It depends on the reason why he has had trouble paying. I don't want to be judgmental. I don't know his personal business. I don't know why he is not paying his bills. If it's not impacting PHA, if it's not tied to PHA, then it's his own personal business. We don't tell him what to do with his money."

But Greene's salary should be more than enough to cover his finances, Reynolds said.

"Not paying his taxes and not paying his mortgage — I don't know what he is doing with the money," she said.

Attempts to reach other commissioners yesterday were unsuccessful. Former Mayor John Street, chairman of the board of commissioners, did not respond to detailed requests for comment.

A spokeswoman for the U.S. Department of Housing and Urban Development, which provides funding to PHA, said HUD would not comment on Greene's mortgage situation.

Reynolds noted, only half joking, that if Greene soon finds himself with no place to live, he'll have to apply and qualify for public housing just like all the other PHA residents.

"He can put in his application but he has to qualify for it," she said. ★

PHILADELPHIA
DAILY
NEWS

THE PEOPLE PAPER

AN EDITION OF The Philadelphia Inquirer

PHA'S CHIEF ALSO
TAXED BY IRS LIEN
PAGE 2

# EXHIBIT D

# The Philadelphia Inquirer

philly●com

C 188st Year, No. 75 ★ City & Suburbs      Saturday, Aug. 14, 2010 ★ Locally Owned & Independent Since 2006 ★ 75 cents      $1 in some locations outside the metro area

## Earlier troubles of PHA chief emerge

**The IRS filed a $62,000 lien against Carl Greene in Dec. In '08, a lawyer sued him after the agency fired her.**

By Christopher K. Hepp
and Nathan Gorenstein
INQUIRER STAFF WRITERS

Carl R. Greene's money woes did not start with the mortgage foreclosure on his South Philadelphia condominium, news of which surfaced 1 week.

Court records show the IRS filed a $52,000 lien in December against the executive director of the Philadelphia Housing Authority, for non-PHA income earned from 2002 to 2006. He paid off the lien in March.

Other court documents indicate that the 53-year-old Greene has had more than personal financial issues.

In 2008, he was sued by a lawyer who said she was fired as PHA's top attorney because she would not "engage in any unethical practices."





PHA's Carl R. Greene, whose mortgage was foreclosed.

The lawsuit, by New Jersey lawyer Maria Allen Phillips, described a strange and unsettling agency where she was not permitted to put anything in writing or have full access to actions pending against PHA. She came to believe that she was being kept in the dark about "secret cases" involving claims of "sexual harassment and wrongful termination" against Greene.

The suit was ultimately dismissed for "lack of prosecution," meaning she did not pursue it.

Attempts to reach Greene on Friday about the lien and the lawsuit were unsuccessful. Calls to the PHA management offices went directly to voice mail, and no one returned messages asking for Greene. Kirk Dorn, a public relations specialist who does contract work for the agen-
See DIRECTOR on A5

## Director

Continued from A1
cy, said Greene had not responded to his calls either.

Greene has not spoken publicly since reporters discovered Thursday that Wells Fargo Bank had foreclosed on his $615,035 condominium in the Naval Square development in the city's Schuylkill section.

Greene is paid $306,370 as executive director of the PHA. He also received a $44,188 bonus last year.

According the Wells Fargo foreclosure suit, Greene had not paid his mortgage for five months, missing his first payment April 1. The missing payments totaled $7,295.89. Overall, he owes $386,685.22 on his mortgage.

Born on Thursday said Greene saw the matter as a "dispute with his mortgage company."

"It is unfortunate that the dispute is now public," Dorn said, "but he plans to deal with the matter in private."

Greene stopped paying his mortgage roughly at the time he was settling his dispute with the IRS, on March 17.

The lien was filed Dec. 28. According to the lien, Greene failed to pay $8,859.02 in taxes in 2002; $25,021.45 in 2003; $6,390.45 in 2005; and $12,479.44 in 2006.

The filing did not explain how the taxes were determined, but said the money owed fell under the category of "small business/self-employed."

It would not be unusual for an official such as Greene, well known in the public-housing field, to earn extra income through consulting or speakers' fees. He has had his own company, CRG Consulting Inc., registered in Pennsylvania, since 2003.

In her suit, Phillips, a lawyer from Moorestown, accused Greene of wrongfully firing her, defaming her in the process.

According to her suit, she was told she was fired as general counsel because of what she described as a "minor civil sanction" for missing a hearing in a case she handled years before PHA hired her.

The explanation was "a pretext to remove me because I made it clear that I would not engage in any unethical prac-

tices," Phillips charged in her suit.

Reached by telephone in New Mexico, where she was vacationing, she did not explain why she let the suit lapse, but said she stood by its allegations. She declined to comment beyond what was in the filing.

Phillips said in her suit that she was approached by a PHA recruiter for the position of general counsel. After undergoing a battery of interviews, she was hired Dec. 19, 2007.

Over the next five days, Phillips said, she was confronted by a dysfunctional and disorganized workplace, and was offered little guidance on how to proceed in her job.

"There were no legal administrative files summarizing cases and legal activity in the office," she wrote. "The office was in such a disarray that no one could produce current status reports."

On the second day, she wrote, other staffers "instructed me on the unwritten ways of PHA] ... It was against policy to put legal conclusions in writing. It was against policy to inform the

agency of legal concerns in writing. Even taking notes was implicitly prohibited."

She noted that Greene had told her none of that. Nowhere in her suit did she specifically identify her informants.

"I was informed about secret cases that are hidden from the general counsel that



ELIZABETH ROBERTSON / Staff
Exterior of PHA director Carl R. Greene's $615,035 condo in Naval Square, foreclosed on for missed payments.

were diverted directly to outside counsel," she wrote. "These were cases involving matters of a sensitive employment nature (such as sexual harassment and wrongful-termination suits against Mr. Greene)."

On her third day on the job, Phillips said, she "discovered several stacks of attorney bills," including some that "seemed exorbitant."

For instance, there were two cases involving: "lead-base paint, a legitimate type of PHA case." One had a "cumulative bill of about $30,000; another was in the millions."

"It occurred to me," she said in her filing, "that there might be a relationship between the high bills for legitimate cases and alleged secret cases. It is possible legitimate cases are being overbilled to cover up fees and cost incurred on the handling of illegitimate cases."

Phillips wrote that after she began "investigating" the bills, she was called to the human resources department and fired.

Contact staff writer Christopher K. Hepp at 215-854-2208 or chepp@phillynews.com.

# EXHIBIT E

# PHILADELPHIA DAILY NEWS

AN EDITION OF The Philadelphia Inquirer

THE PEOPLE PAPER

**EX-EMPLOYEE:**

## CARL GREENE HARASSED ME

**PAGE 4**

# Another cloud on Greene's horizon

**By WENDY RUDERMAN, CATHERINE LUCEY & BARBARA LAKER**
ruderm@phillynews.com
215-854-2960

About the time that Carl R. Greene stopped making mortgage payments on his luxury condo, a female employee filed a sexual-harassment complaint against Greene and the Philadelphia Housing Authority, the *Daily News* confirmed yesterday.

Elizabeth Helm, who had worked as a PHA architect and project designer for about a year, alleged that Greene had engaged in sexually inappropriate behavior toward her. She lodged a complaint with both the Pennsylvania Human Relations Commission and the U.S. Equal Employment Opportunity Commission on April 30, according to PHRC spokeswoman Shannon Powers.

"I can confirm that we do have a complaint filed under Elizabeth Helm," Powers said yesterday. "It is against the Housing Authority but because it's a sexual harassment claim, it does name [Greene] as a respondent."

Powers said she could not provide further details, citing an "open investigation" into Helm's claims against Greene, who heads PHA as its executive director.

Last night, Greene, through his spokeswoman, vigorously denied the allegations, though he provided no specifics.

"PHA is aware of the filing of an agency complaint by Ms. Helm against both PHA and Mr.

Greene," Nichole Tillman wrote in an e-mail. "It should be noted that a complaint merely sets forth allegations and that no conclusions of wrongdoing have been reached. The complainant has not yet had to prove her allegations, nor has PHA or Mr. Greene been afforded an opportunity to present a defense."

Tillman added, "Accordingly, it would be highly improper to draw any conclusions based on the unsubstantiated allegations in the complaint. Both PHA and Mr. Greene vigorously deny the allegations and look forward to defending the matter."

Helm, 29, who was hired by PHA in February 2009 as a "graduate architect" earning $52,000 a year, no longer works for PHA. She did not respond to notes left by the *Daily News* at her Rittenhouse Square apartment or phone messages left at her family home in Pittsburgh.

Greene — who Tillman said told staff that he would be out of the office again today — has not been heard from publicly since news broke last week that his $615,000 Naval Square town house was in foreclosure. Court documents show that Greene stopped making mortgage payments in April. Wells Fargo Bank filed the foreclosure action against Greene in late July, claiming that he owed nearly $387,000.

Court records also show that the IRS in December filed a roughly $52,000 tax lien against Greene for failing to pay taxes on "small business/self-employed"

income for 2002, 2003, 2005 and 2006. Greene paid off the federal tax lien in March, records show.

Greene, who has headed PHA since 1998, is one of the highest paid public officials in the city. He earns $306,870 and received a $44,188 bonus last year.

Members of PHA's Board of Commission — ers have said they're perplexed by Greene's financial woes and troubled by his absence.

Former Mayor John Street, the board's chairman, and two other PHA commissioners — City Councilwoman Jannie L. Blackwell and Nellie Reynolds — said they had reached out to Greene but as of yesterday afternoon hadn't heard back from a man known as a workaholic who typically stays connected to PHA through cell phone and e-mail.

A fourth PHA commissioner, Debra Brady, said she believes Greene owes the public an explanation.

"I think he needs to explain to the public what's going on," she said yesterday.

That said, Brady added, "I'm very, very pleased with the work he's done with PHA. ... That's why to read something like this in the paper, it's hard to know what's going on. I hope he's OK."

Blackwell also expressed support for Greene and said that he is "a visionary, one of the best in the nation when it comes to housing"

Greene has earned many fans, but he also has made foes who have criticized his management of PHA.

Among them is Marcia Allen Phillips, a Moorestown, N.J., lawyer who worked for Greene for one week in December 2007.

In 2008, Allen Phillips filed a lawsuit against Greene, alleging she was fired as PHA's general counsel because she asked too many questions about the secretive inner workings of PHA.



Carl Greene

"I got there, and I saw there were no records. There were no files, no documentation of issues from the past. It was like PHA was just born. I cannot work for an agency where they can't document anything," she said last night.

Several employees approached her to complain about "claims of sexual harassment" and other "wrongful termination," she said. "I wasn't trying to create a stir. I just started asking questions and I felt like I was supposed to sit there, not ask questions and acquiesce."

She said she was fired after five days. When she asked why, she said a human resources employee told her it was for some kind of "civil sanction," which she contended made no sense.

In the end, she decided not to pursue the suit. "I felt like he was a large fish. Why am I trying to take him on by myself? Why should I take time and money to unravel all this?" she asked. ★

# EXHIBIT F

# The Philadelphia Inquirer

philly●com

C  181st Year, No. 80 · City 2: Suburbs   **Thursday, Aug. 19, 2010 ★ Locally Owned & Independent Since 2006 ★ 75 cents**   60 be more including outside the metro area

# PHA chief also accused of sex harassment



Carl R. Greene,
PHA director.

By Jennifer Lin, Christopher K. Hepp,
and Nathan Gorenstein
INQUIRER STAFF WRITERS

On top of financial and tax woes, Philadelphia Housing Authority Executive Director Carl R. Greene now faces accusations of sexual harassment and improperly soliciting payments from employees, vendors, and law firms.

In a letter obtained by The Inquirer, John M. Elliott, an attorney for a

An April letter from a lawyer alleges "predatory...
misconduct." It also says Greene solicited cash and gifts.

29-year-old employee of the authority (PHA), accuses Greene of "serial predatory sexual misconduct."

Elliott alleges that Greene promised a promotion to Elizabeth Helm, an interior designer and planner at PHA, if she submitted to his sexual advances.

In an interview Wednesday, he charged the five-member PHA board with turning a blind eye to Greene's abusive behavior.

Elliott said Greene was improperly using his position to solicit cash and personal gifts from PHA's employees,

vendors, and law firms. PHA, Elliott said, hosts four parties a year in honor of Greene and asks for cash or checks for the executive director.

Kirk Dorn, a PHA spokesman, called the letter "incendiary." "It's an allegation made by one person," Dorn said. "PHA denies the allegations in the letter and is defending against them."

Richard A. Zappile, the PHA chief of
See GREENE on A13

## Greene

Continued from A1

police, said that he organizes four parties a year for top managers and attorneys who do contract work for the agency, and that participants, including Greene, pay their own way.

"They are privately run," Zappile said, "and the money goes toward the dinner."

Elliott outlined his allegations against Greene and PHA's board in a four-page letter dated April 21 that was sent to 12 people, including Gov. Rendell, former Mayor John F. Street, and Mayor Nutter. Rendell was chairman of PHA at the time of Greene's hiring. Street is the current chairman.

The letter only came to light in the wake of last week's disclosure of Greene's financial problems. Greene's personal bank, Wells Fargo, foreclosed in July on his mortgage on a $615,000 house, while the IRS placed a $52,000 lien on the house in December for unpaid taxes on non-PHA income.

Charges of sexual misconduct have shadowed Greene since his arrival in Philadelphia in 1998 from the Detroit Housing Commission.

In his former job, a housing-agency auditor accused Greene of kissing, touching, and fondling her, and promising her a promotion if she "submitted to his demands." Rendell, who as mayor at the time headed PHA, hired Greene and gave him a contract that ensured his job even if he lost the Michigan case. The case brought by Gertrude Faye Johnson was settled out of court on the eve of a trial.

At PHA, at least one other case of sexual harassment has been made against Greene. Melissa Shingles, a former senior management specialist at PHA, filed a com-

plaint with the Pennsylvania Human Relations Commission in 2004. The case was closed in 2006 after a settlement was reached between the sides. Shingles declined to comment Wednesday.

Elliott, a prominent lawyer based in Blue Bell, described Rendell, who recruited Greene for the PHA job in 1998, as Greene's "sponsor." Elliott said no one who received the letter had replied directly to him. The Human Relations Commission, however, reached out to Elliott and said the matter had been referred to the agency by Rendell. Helm filed a complaint April 30, and an investigation opened May 13.

A spokesman for Rendell, Gary Tuma, said the governor did not recall the letter from Elliott. But regardless, Rendell has no authority over the PHA. "It's not a gubernatorial matter," Tuma said.

Greene has not shown up for work the last three days. In a statement Wednesday, PHA disclosed that Greene, who is paid more than $300,000 a year, was on a leave of absence for several weeks "to get his personal affairs in order."

PHA said Greene had paid his mortgage through October. The IRS lien, meanwhile, was settled in March.

A PHA spokeswoman, Nichole Tillman, acknowledged the complaint from Helm. She added in a written reply, "The complainant had not yet had to prove her allegations, nor has PHA or Mr. Greene been afforded an opportunity to present a defense."

But at the first mediation session on the matter before the Human Rights Commission, on Aug. 2 in Philadelphia, no one from PHA showed up, Elliott said.

"Right now, it's just the sound of silence," the lawyer said in an interview. "A pattern of sweeping his misconduct under the proverbial carpet, which only emboldens

a predator like Greene."

Street said Greene had committed to meeting with the PHA board and reporters to answer questions about the current controversies.

A date has not yet been set, but both could occur by Friday.

"He made a commitment...that he will answer questions," Street said.

The PHA board chairman said he did not recall receiving the letter from Helm's attorney. Street said he wanted to look at the letter and see whether reading it jogged his memory.

"I don't want to sit here and say I didn't see it," he said. But he said that during Greene's 13 years, he has not heard complaints about his conduct with female employees.

"As far as I know, Carl was conducting himself in an appropriate way," Street said. "These recent allegations are a bit of a surprise to me."

When he spoke to Greene on Wednesday, the former mayor said, he did not quiz him on the details of the controversies that have arisen in the last week.

Street said he still had confidence in Greene. On his missed mortgage payments, Street added, "he said that he wasn't paying attention, he was knee-deep in the business of the Housing Authority, and just was kind of throwing that stuff in a box."

Street said he did not recall the board's ever approving any payments to settle sexual-harassment claims.

He also said he had never heard complaints that Greene received any improper payments.

"Thirteen years he's been here, and I think he has done a pretty good job. I don't know if you can just wipe it all with a few lawsuits or letters," Street said.

In the letter outlining Helm's sexual-harassment complaint, Elliott wrote that Greene "insisted" that Helm meet him after work April 21 at the bar of

the Prime Rib Restaurant at 1701 Locust St. to discuss PHA-related matters.

In the letter, he called her the "most recent victim" of Greene's pattern of sexual harassment.

Helm, who had worked at PHA for about a year, was manager of interior planning and design. That night, Greene praised her work and said he was processing her promotion paperwork.

He then made advances including "touching, grabbing, and groping her," the letter said. Despite her insistence that he stop, Greene "continued to forcibly and physically pursue inappropriate and unwanted contact of an intimate nature."

The letter stated that Greene admitted to Helm that his contact was unwelcome, stating as he grabbed her, "I know that you don't want to kiss me."

Dorn said Helm was on an unpaid leave from PHA.

The other PHA commissioners were not available for comment.

Debra L. Brady, the head of Philadelphia Writ Services and the wife of U.S. Rep. Bob Brady (D., Pa.), did not respond to requests for comment left at her business and through her husband's press office.

Patrick J. Eiding, president of the Philadelphia Council, AFL-CIO, is on vacation and not responding to messages, his office said.

Earlier this week, Councilwoman Jannie L. Blackwell said she was behind Greene "1,000 percent," but was in a meeting when a reporter requested an interview.

Tenant representative Nellie Reynolds did not respond to two telephone messages.

Contact staff writer Jennifer Lin
at 215-854-5659 or
jlin@phillynews.com.

Inquirer staff writer Jeff Shields
contributed to this article.

# EXHIBIT G

# The Philadelphia Inquirer

philly●com

C* 181st Year, No. 85 • City & Suburbs    Wednesday , Aug. 25, 2010 ★ Locally Owned & Independent Since 2006 ★ 75 cents    $1 in some locations outside the metro area

# Greene's PHA job appears in doubt

**Legal work:** Spending on outside counsel has soared, and politically powerful firms benefited.

By John Sullivan and Mark Fazlollah
INQUIRER STAFF WRITERS

The Philadelphia Housing Authority has paid out more than $33 million in legal fees since 2007 under executive director Carl R. Greene to some of the city's most politically powerful law firms, documents show.

More than half the legal work went to

two firms — Ballard Spahr, which received $9 million, and Wolf Block, which was paid $8 million before it disbanded last year.

During Greene's tenure, spending on outside legal work has skyrocketed, nearly doubling over the last three years, according to documents released Tuesday by the authority in response to an open-records request filed by The Inquirer.

The PHA spent more in 2009, $11.2 million, than it did over two years in 2002 and 2003.

In 2002, an attorney with the U.S. Department of Housing and Urban Development expressed "growing concern
*See* **PHA** *on A13*

**Sex-harassment cases:** The board plans to release details on three cases that it didn't know about.

By Nathan Gorenstein, Craig R. McCoy, and Jeff Shields
INQUIRER STAFF WRITERS

Carl R. Greene's job running the Philadelphia Housing Authority is increasingly in doubt, as members of the agency's previously hands-off board say they will soon make an "aggressive" decision about Greene's future.

**Carl R. Greene** is on leave from his PHA post and is being treated for stress, a spokesman said.

The board is also preparing to release more details about four sexual-harassment cases filed against Greene in recent years.

Three of the claims have been settled, and a $250,000 payment in the fourth was agreed to Friday by PHA's insurer.

None of the claims, or settlements, was ever disclosed to the board's members by Greene or other staff, said chairman and former Mayor John F. Street.

Street stopped short of saying Greene should be dismissed, but left little doubt his support for the PHA head was waning.

"I think the sexual-harassment cases really change everything," Street said in
*See* **GREENE** *on A13*

# Greene's PHA job appears in doubt

GREENE from A1

an interview, when asked if Greene should remain as PHA executive director.

"There is a huge, huge issue here," Street said. "It's not like there was one case, or two cases or three cases, but four."

City Controller Alan Butkovitz, who appoints two members to the five-person board, said, "I don't think it's acceptable to have a person in a position of power being serially accused of sexual harassment."

"The board is taking aggressive action on this," he said.

A source familiar with the board's discussions said a majority had agreed to vote for Greene's suspension, as early as its next meeting Thursday, as a possible precursor to termination.

Until news broke two weeks ago that Greene faced foreclosure on his home, a federal tax lien on outside income and a sexual-harassment claim, the board had taken little heed of outside criticisms.

When Greene's leadership had come under scrutiny in the past, the agency had fought back hard, employing high-priced outside counsel and a public-relations firm. The board exercised little apparent oversight, with two of its members attending meetings only sporadically.

PHA spokesman Kirk Dorn said Tuesday that Greene was on leave receiving treatment for stress and could not be reached for comment.

Street said he was particularly upset that the board was kept in the dark about the harassment cases brought against Greene, 53.

"We should have known, and I'm going to find out why we didn't," he said.

Greene came to Philadelphia in 1998 from Detroit, where he also faced a sexual-harassment accusation.

Then-Mayor Rendell worked hard to woo him nonetheless, sending an attorney and a tenant leader to Detroit to investigate the allegations. Satisfied that Greene had done nothing improper, Rendell offered him PHA's top job. The Detroit case was settled out of court on the eve of a trial in 2000.

Three of the four harassment claims that have been filed here in Philadelphia have been settled with payments by PHA's insurance company.

The $250,000 settlement agreed to Friday came in the case of Elizabeth Helm, 29, a PHA interior designer whose accusation, disclosed two weeks ago, helped ignite the current firestorm over Greene's job performance.

Street said the board was never informed of either the complaints or the cash settlements.

A PHA spokesman has said board approval of the payments was not required because the checks were issued by the agency's insurance company. But PHA used its own cash to pay a $150,000 deductible, and Street said the board was never notified of that expenditure.

An expert in corporate governance expressed astonishment that agency managers would keep that information from the board.

"I think that's very strange," said Charles Elson, director of the University of Delaware's Weinberg Center for Corporate Governance.

"These claims are relevant to the board's evaluation of the person's performance," he said. "The fact that something like this would arise should be considered by the board — and considered very carefully. And you can only consider it carefully if you know about it."

Mayor Nutter, in an interview, said he found it "baffling that an insurance company ... could make a quote-unquote settlement without some notification, some contact, some authorization, some action by the board of directors."

The three earlier sexual-harassment settlements were paid in 2005, 2007, and 2008.

The board in 2010 approved spending $6.8 million in premiums for insurance coverage from Housing Authority Insurance Group, a Connecticut-based nonprofit that has written PHA's coverage since 1999. Last year, the agency received a $1 million rebate because its claims were low.

Most of the premium went to insure PHA's real estate, but $533,000 was spent to cover PHA's officials, including Greene, against claims connected to their official duties.

For that, PHA obtained coverage of $2 million, with a $150,000 deductible. That means the premium was equal to almost 30 percent of the coverage.

Greene is one of the most powerful public officials in the city. His state-chartered agency is the largest landlord in Pennsylvania, housing 81,000 people in 32,000 units and spending $280 million on development projects. He is credited for shepherding through a number of major construction projects, and improving the agency's housing maintenance and management.

But he has also faced years of complaints that his management style was abrasive and dictatorial. Street acknowledged criticism that the PHA board has been too hands-off.

"You can always criticize the board," he said. "No one was criticizing us when we were building houses. If Carl hadn't gotten himself involved in this trouble, Carl would still be building houses, and we'd still be a good board.

"We wanted him to run his agency," said Street. "We weren't going to be micromanaging the executive director."

Greene is currently on a two-week leave, prompted by stress, he said last week.

Greene has also been grappling with disclosures that the IRS filed a lien against him for $52,000 in back taxes and that foreclosure proceedings were started against his $615,000 home.

He said the lien, now paid off, prevented him from making his condominium payments. His mortgage is now paid through October, he said.

Whether Greene will attend the board's monthly meeting, scheduled Thursday, is unknown. But for the first time in recent months, all of the PHA's board members are expected to appear.

One member, Debra Brady, who runs Philadelphia Writ Service Inc. and is the wife of U.S. Rep. Bob Brady (D., Pa.), the city's Democratic Party chairman, missed 11 of 15 board meetings held between February 2009 and this June.

Patrick J. Eiding, the head of the regional AFL-CIO, missed six of those meetings. Union members perform virtually all of PHA's construction and maintenance work.

Both of their seats are filled by Butkovitz, the city controller, who recently reappointed Brady. Eiding's current term is up next month. He hopes to continue on the board, said Butkovitz, who expressed dis-

may at Brady's and Eiding's frequent absences.

"It's not good. I'm on the [city] pension board, and I'm at every single meeting."

Eiding has not returned calls seeking comment.

A spokesman for Debra Brady said she has missed recent meetings because of her mother's illness, and missed meetings in 2008 because of back surgery. The spokesman, Ken Smukler, said Brady offered to step down from the board at that time.

Street and two other board members are regular attendees. They are City Council member Jannie L. Blackwell and Nellie Reynolds, a PHA tenant.

Blackwell said she did not want to take any immediate action.

"There will be something introduced pertaining to Carl Greene and his leadership," Blackwell said, but she wants to delay a vote until Greene returns from his leave.

"In the bigger picture, we don't have anyone who does what he does, and he's the only one moving housing in the recession," Blackwell said.

In 2002, HUD auditors ripped into PHA, saying that Greene had been unfair in his hiring practices, ignoring educational requirements and rules that jobs be put up for competition.

The audit also found that he was a "demanding supervisor" whose style had prompted some underlings to quit, though it said that his management approach did not violate federal or state law.

The auditors said their effort to dig into Greene's conduct had been met with stiff resistance from lawyers with the Ballard Spahr firm, outside counsel hired by PHA. The Ballard lawyers insisted on sitting in on the auditor interviews and restricted access to PHA board members.

Among other criticisms, HUD faulted Greene for hiring the daughter of PHA board member Reynolds, and for giving her a big raise just three weeks after putting her on the payroll.

Contact staff writer Nathan Gorenstein at 215-854-2797 or ngorenstein@phillynews.com.

Inquirer staff writers Jennifer Lin, John Sullivan, and Amy Worden contributed to this article.

# EXHIBIT H

# THE PHILADELPHIA HOUSING AUTHORITY
## AGENDA
### THURSDAY, AUGUST 26, 2010

A.   Call to Order - Honorable John F. Street, Chair
     The Philadelphia Housing Authority Board of Commissioners

B.   Approval of Minutes of Regular Meeting held on June 23, 2010 of the Authority as distributed.

**New Business**

1.   Resolution authorizing **THE BOARD OF COMMISSIONERS OF THE PHILADELPHIA HOUSING AUTHORITY TO UNDERTAKE AN INDEPENDENT INVESTIGATION OF ALLEGATIONS MADE AGAINST THE PHILADELPHIA HOUSING AUTHORITY AND ITS EXECUTIVE DIRECTOR; TO PLACE THE EXECUTIVE DIRECTOR ON LEAVE PENDING THE OUTCOME OF THE INVESTIGATION.**

2.   Resolution authorizing **THE PHILADELPHIA HOUSING AUTHORITY TO (1) CONDUCT SEXUAL HARASSMENT TRAINING, (2) TO REVIEW THE PHA SEXUAL HARASSMENT POLICY, AND (3) TO RECOMMEND ANY NECESSARY CHANGES TO THE AUTHORITY'S SEXUAL HARASSMENT POLICY.**

August 26, 2010

**BOARD OF COMMISSIONERS**

**SUBJECT:**

This resolution authorizes the Board of Commissioners ("Board") of the Philadelphia Housing Authority ("Authority") to undertake an independent investigation of allegations made against the Philadelphia Housing Authority and its Executive Director. The resolution further authorizes the Board to place Carl R. Greene, Executive Director of the Authority, on administrative leave pending the outcome of the investigation.

**RESOLUTION SUMMARY:**

Certain allegations of inappropriate professional conduct by the Executive Director of the Authority have recently been brought to the attention of the Board of Commissioners of the Authority. It is the Board's obligation to review and investigate these allegations and ensure a healthy working environment for the employees of the Authority and to ensure the continuous uninterrupted operations of the Authority. Accordingly, the Board has determined to take the actions set forth in the attached resolution to ensure a thorough review and investigation of the allegations in order to obtain the required information necessary to respond and address the allegations.

## RESOLUTION NO. 1

### RESOLUTION AUTHORIZING THE BOARD OF COMMISSIONERS OF THE PHILADELPHIA HOUSING AUTHORITY TO UNDERTAKE AN INDEPENDENT INVESTIGATION OF ALLEGATIONS MADE AGAINST THE PHILADELPHIA HOUSING AUTHORITY AND ITS EXECUTIVE DIRECTOR; TO PLACE THE EXECUTIVE DIRECTOR ON LEAVE PENDING THE OUTCOME OF THE INVESTIGATION

**WHEREAS**, the Board of Commissioners (the "Board") of the Philadelphia Housing Authority ("Authority") is the governing body of the of the Authority and is charged with the oversight of the Authority; and

**WHEREAS**, the Board is responsible for the appointment and supervision of the Executive Director of the Authority; and

**WHEREAS**, Carl R. Greene has served as Executive Director (the "Executive Director") of the Authority for in excess of 12 years and has established an accomplished record throughout his tenure at the Authority; and

**WHEREAS**, the Board has recently been made aware of certain serious allegations made against the Executive Director with respect to his professional conduct; and

**WHEREAS**, the Board has determined that these allegations merit an immediate, thorough and independent investigation; and

**WHEREAS,** it is the Board's goal to complete the investigation and make recommendations for corrective action within 30 days; and

**NOW THEREFORE BE IT RESOLVED**, that the Philadelphia Housing Authority Board of Commissioners hereby authorizes the Chairman of the Board, or his authorized designee (hereinafter referred to as the "Chairman") to take any and all actions on behalf of the Board in order to undertake an investigation of these allegations, including an inspection of the Authority's financial records; and make recommendations for corrective actions as needed; and

**BE IT FURTHER RESOLVED**, in furtherance of these matters, the Board through the Chairman shall be authorized, in accordance with the Authority's policies, including the relevant procurement policies, to hire such experts and persons to conduct such independent investigation; and

**BE IT FURTHER RESOLVED**, that the Board through the Chairman shall be responsible for conducting the independent investigation, and the Chairman shall consult with the Board on an continuing and on-going basis with respect to its findings; and

**BE IT FURTHER RESOLVED**, that the findings of the independent investigation and any recommendations for corrective action shall be reported to the Board; and

**BE IT FURTHER RESOLVED**, that the Executive Director shall be placed on administrative leave pending the results of the investigation; and

**BE IT FURTHER RESOLVED**, that during the period the investigation is pending, the Executive Director shall not report to work at the Authority, contact or direct the Authority's employees or consultants, or access the Authority's systems.

3

**PHILADELPHIA HOUSING AUTHORITY**
**RESIDENT LEADERSHIP/BOARD OF COMMISSIONERS**
**FACT SHEET FOR RESOLUTION NO. 1**

**BOARD MEETING DATE:**                    August 26, 2010

**BACKGROUND INFORMATION:**

Certain allegations of inappropriate professional conduct by the Executive Director of the Authority have recently been brought to the attention of the Board of Commissioners ("Board") of the Philadelphia Housing Authority ("Authority").  It is the Board's obligation to review and investigate these allegations and ensure a healthy working environment for the employees of the Authority and to further ensure the continuous uninterrupted operations of the Authority.  Accordingly, the Board has determined to take the actions set forth in the attached resolution to ensure a thorough review and investigation of the allegations in order to obtain the required information necessary to respond and address the allegations accordingly.

To that end, this resolution authorizes the Board of Commissioners of the Philadelphia Housing Authority to undertake an independent investigation of allegations made against the Philadelphia Housing Authority and its Executive Director. The resolution further authorizes the Board to place Carl R. Greene, Executive Director of the Authority, on administrative leave pending the outcome of the investigation..

4

# EXHIBIT I

00/25/2010 WED 11:26  FAX                                                      ☑002/002



### HAINES & ASSOCIATES

CLIFFORD E. HAINES
DIRECT DIAL  215-246-2201
EMAIL  CHAINES@HAINES-LAW.COM

August 24, 2010

Honorable John Street
Chairman, Philadelphia Housing Authority
12 South 23rd Street
Philadelphia, PA 19103

    **RE:   Carl Greene**

Dear Mayor Street:

    This is to advise you that I represent Carl H. Greene.  Mr. Greene is presently undergoing medical diagnosis and treatment outside Pennsylvania.  Until such time as that process has been completed, I would ask that the Board take no position regarding Mr. Greene's status with the Authority.  I expect that Mr. Greene will remain under medical care for approximately three (3) weeks.

              Very truly yours,

              *Cliff Haines*

              CLIFFORD E. HAINES

CEH:

Cc:    Councilwoman Jannie L. Blackwell
       Deborah L. Brady
       Patrick J. Eiding, Philadelphia Council AFL-CIO President
       Nellie W. Reynolds
       Mayor Michael Nutter

# EXHIBIT J

 **philly●com**
anything & everything philly

**🖨 PRINT THIS**

Posted on Fri, Sep. 3, 2010

# Two more women say PHA director Carl Greene harassed them

By Nathan Gorenstein

Inquirer Staff Writer

Two more woman have complained that they were sexually harassed by the Philadelphia Housing Authority's executive director, Carl R. Greene, the agency's board chairman said yesterday.

The women do not intend to file formal complaints against Greene, but approached the board on their own in an attempt to put the incidents behind them, said John F. Street, the board chair and former mayor.

"They are sick of it, they have been afraid, and they have been frightened to death about all this, and now they see some light at the end of the tunnel," Street said.

"Their motivation is not to file a complaint" in the hope of receiving a cash settlement, he said.

The new, informal complaints are in addition to four sexual harassment complaints filed against Greene since 2004 with the Pennsylvania Human Relations Commission. Their disclosure resulted in Greene's being suspended from his job by the board last week.

Greene will remain at a medical treatment facility for some weeks, said his attorney, Clifford E. Haines, who expressed astonishment at Street's comments.

"John Street tells a newspaper reporter that he has some unknown person making some unidentified complaint about someone who has been in the press for weeks? I don't know where to go with that," said Haines. "Mr. Street and I are quickly becoming adversaries, unfortunately."

Street said one woman is a current PHA employee and the other a former employee.

"We didn't ask anyone" to report incidents involving Greene, he said. "These folks came forward" after receiving assurances their identities would not be disclosed.

Street also said, "We have not been able to come up with a record of sexual harassment against any other employees" of PHA.

Three of the four earlier complaints have been settled with cash payments by PHA's insurance carrier, and a fourth is under negotiation. The total cost could exceed $900,000.

Greene was suspended because the board never knew of the complaints and because the first three payments, for $648,000, were never disclosed to it. A settlement for $250,000 had been tentatively agreed to last month in a complaint filed by Elizabeth Helm, a 29-year-old interior designer, although Helm's lawyer now says he has seen no settlement papers and will not settle for less than $375,000.

The PHA internal investigation into how the complaints and settlements were handled will determine Greene's future. The board is set to meet again on Thursday, with completion of that review scheduled for the end of this month.

But Haines said Street's comment and other actions by the board "suggest a decision already has been made."

"They called me last Friday and said they had all Carl's personal belongings boxed up and wanted to know what should be done with them," he said.

Street said he offered to send Greene any personal items, but did not order his office cleaned out.

Haines also suggested that board members should have known if Greene was behaving inappropriately.

"Who was overseeing him for the last 14 years? Who knew about what Carl was doing, or not doing, and turned their back on it?" Haines said.

He added that to terminate Greene's contract, PHA has to "prove he has violated the terms of his contract. Just because someone said he did or he didn't do something doesn't make it so."

The PHA internal probe extends beyond the details of the complaints to include how they were handled by PHA managers and various attorneys.

Street has said one complaint, from 2004, was settled for $200,000 with two checks. One from the insurer was for $101,000, and one from PHA for $99,000, apparently an effort to stay below the $100,000 expenditure ceiling that would have required a board vote.

Street said he should know by next week how the details of the settlements were handled inside PHA, including how the agency handled the $350,000 settlement of a 2008 case.

Haines said that Greene did not sign the settlement agreements in the three cases between 2004 and 2008, but that he could not say who did.

Negotiations with the four complainants were handled by outside counsel hired for those cases, and Street said their conduct may come under scrutiny.

"Why wouldn't somebody at some time have notified the board?" he asked.

Greene, as the person facing the accusation, could not have been the person who authorized a settlement, Street said.

Five outside attorneys have been involved in the various cases, and most have not responded to repeated requests for comment. The law firm of Cozen O'Connor worked on two settlements, according to its CEO and President Thomas "Tad" Decker.

Late Thursday night, Decker said his firm had been fired by PHA after attorneys insisted that board members be informed of a second sexual harassment suit that Cozen handled, the third case of four against Greene.

"It's very clear in the cases in which we were involved that we anticipated that the board was going to be informed by management of the terms of the settlements and the background," Decker said. "We recommended that the board be fully informed of all the issues on the case. Thereafter, our engagement was terminated."

---

Contact staff writer Nathan Gorenstein at 215-854-2797 or ngorenstein@phillynews.com.

**Find this article at:**
http://www.philly.com/philly/news/homepage/20100903_sell__nufinalgrafs_for_C_edition_____Two_more_women_say_PHA_director_Carl_Greene_harassed_them.html

☐ Check the box to include the list of links referenced in the article.

© Copyright | Philly Online, LLC. All Rights Reserved. Any copying, redistribution or retransmission of any of the contents of this service without the express written consent of Philly