# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL R. GREENE | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | Civil Action No. 2:10-cv-04529-RB |
| v. | : | |
| | : | |
| JOHN F. STREET, et al., | : | |
| | : | |
| *Defendants.* | : | |

## ORDER

AND NOW, this _____ day of _____, 2010, it is hereby **ORDERED** that Motion of Defendants John F. Street, Debra L. Brady, Patrick J. Eiding, and Nellie W. Reynolds to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(6) is **DENIED**.

_____
RONALD L. BUCKWALTER, U.S.D.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL R. GREENE | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | Civil Action No. 2:10-cv-04529-RB |
| v. | : | |
| | : | |
| JOHN F. STREET, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

---

**RESPONSE IN OPPOSITION TO MOTION OF DEFENDANTS JOHN F. STREET, DEBRA L. BRADY, PATRICK J. EIDING, AND NELLIE W. REYNOLDS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

---

Clifford E. Haines (PA 09882)
Lauren A. Cates (PA 200620)
**HAINES & ASSOCIATES**
1835 Market Street
Suite 2420
Philadelphia, Pennsylvania 19103
Phone: 215-246-2200
Fax:     215-246-2211
*Attorneys for Plaintiff*

Date:   November 12, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.    RELVEVANT FACTS ............................................................................... 1

II.   LEGAL STANDARD FOR A MOTION TO DISMISS ............................... 9

III.  ARGUMENT ......................................................................................... 10

    A.  Plaintiff's Complaint Adequately Alleges a Procedural
       Due Process Violation .................................................................. 11

       1.  *Mr. Greene Had a Property Interest in His Continued Employment* ........... 11

       2.  *Mr. Greene Had a Liberty Interest in His Reputation* ................... 14

       3.  *Qualified Immunity does not Shield the Board from Liability for
          Plaintiff's Due Process Claim* ........................................... 16

    B.  Plaintiff's Complaint Adequately Alleges Breach of Contract ............ 19

    C.  Street is Not Immune from Plaintiff's Claims for Defamation
       and False Light Invasion of Privacy ............................................. 20

    D.  Plaintiff Adequately Pleads Defamation by Street ......................... 23

    E.  Plaintiff Adequately Pleads False Light Invasion of Privacy by
       Street ............................................................................... 26

    F.  Sovereign and/or Governmental Immunity Do Not Bar Plaintiff's Claims ......... 26

IV.   CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Angelilli v. Borough of Conshohocken,*
   1996 U.S. Dist. LEXIS 16994 (E.D. Pa. Nov. 15, 1996)........................................................22

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009).................................................................................................10, 11

*Bakare v. Pinnacle Health Hosp., Inc.,*
   469 F. Supp. 2d 272 (M.D. Pa. 2006) ...............................................................................3

*Bell Atlantic v. Twombly,*
   550 U.S. 544 (2007).....................................................................................................9, 10

*Biggans v. Foglietta,*
   170 A.2d 345 (Pa. 1961) ...........................................................................................22, 23

*Estate of Smith v. Marasco,*
   2006 U.S. Dist. LEXIS 58475 (E.D. Pa. July 13, 2006)........................................................27

*Fanelle v. LoJack Corp.,*
   2000 U.S. Dist. Lexis 17767 (E.D. Pa. Dec. 7, 2000) ....................................................24, 25

*Fanelle v. LoJack Corp.,*
   79 F. Supp.2d 558 (E.D. Pa. 2000) ...................................................................................23

*Good v. Dauphin Cty. Soc. Servs. for Child. And Youth,*
   891 F.2d 1087 (3d Cir. 1989)........................................................................................17, 19

*Goodman v. Hasbrouck Heights Sch. Dist.,*
   2007 U.S. Dist. LEXIS 45684 (D.N.J. June 20, 2007) .........................................................14

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982)...........................................................................................................16

*Hill v. Borough of Kutztown,*
   445 F.3d 225 (3d Cir. 2006)...........................................................................11, 14, 15, 16

*Kentucky v. Graham,*
   479 U.S. 159 (1985)...........................................................................................................19

*Lamb Foundation v. North Wales Borough,*
   2001 U.S. Dist. LEXIS 18797 (E.D. Pa. Nov. 16, 2001)..................................................21, 22

*Linan-Faye Constr. v. Hous. Auth. of Camden,*
  49 F.3d 915 (3d Cir. 1995)..................................................................14

*Lindner v. Mollan,*
  677 A.2d 1194 (Pa. 1996) ..................................................................20

*Morgenstern v. Fox T.V. Stations of Phila.,*
  2008 U.S. Dist. Lexis 92990 (E.D. Pa. Oct. 31, 2008) ........................26

*New York Times v. Sullivan,*
  376 U.S. 254 (1964)............................................................................25

*Perry v. Sinderman,*
  408 U.S. 593 (1972).................................................................12, 13, 18

*Phillips v. County of Allegheny,*
  515 F. 3d 224 (3d. Cir. 2008).......................................................9, 10, 27

*Reich v. Beharry,*
  883 F.2d 239 (3d Cir. 1989)................................................................14

*Sokol v. Reading Reg. Airport Auth.,*
  2000 U.S. Dist. LEXIS 8735 (E.D. Pa. May 25, 2000) ....................16, 17

*Stana v. Sch. Dist. of the City of Pitts.,*
  775 F.2d 122 (3d Cir. 1985)........................................... 11, 12, 18

## STATUTES

42 U.S.C. § 1983 ...............................................................................9, 11

1 Pa. C.S. § 2310..................................................................................26

42 Pa. C.S. § 8343................................................................................23

42 Pa. C.S. § 8541................................................................................27

35 P.S. §1550 .......................................................................................13

**RESPONSE IN OPPOSITION TO MOTION OF DEFENDANTS JOHN F. STREET, DEBRA L. BRADY, PATRICK J. EIDING, AND NELLIE W. REYNOLDS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

This action involves claims by Carl R. Greene, the former Executive Director of the Philadelphia Housing Authority ("PHA"), for the malicious and unwarranted conduct of the PHA Board of Commissioners, and in particular its chairman John F. Street, during a one-month period that ended in the termination of Mr. Greene's employment. In August 2010, prompted by a series of newspaper articles about Mr. Greene's personal mortgage and tax issues, Street and the Board began an orchestrated campaign to deprive Mr. Greene of his position as Executive Director and to destroy his hard-earned reputation as a shrewd and capable leader in the field of public housing. This campaign both fueled and fed on a media frenzy – featuring Street – that reported Street's baseless, unfounded, and defamatory statements regarding Mr. Greene. Street's malicious attacks went unchecked by his fellow Board members and worked to deprive Mr. Greene of his due process rights, violate his Employment Agreement, and severely damage his reputation and ability to earn a living.

## I.     RELEVANT FACTS

Mr. Greene became Executive Director of the PHA on March 3, 1998. Until the sudden turn of events that gave rise to this dispute, Mr. Greene was hailed – by those in the Philadelphia, including Street, and throughout the United States – as an industry leader in the field of public housing. Under his leadership, the standard of public housing in Philadelphia was transformed and the standard of living for economically disadvantaged Philadelphians vastly improved. Because of Mr. Greene's expert leadership and unprecedented success, the PHA, by and through Street, entered into a new Employment Agreement with Mr. Greene on March 29, 2007. In that agreement, PHA acknowledged that "Mr. Greene has consistently lead and managed the PHA in

an expert fashion, achieved the goals and objectives of the PHA [Strategic Operating Plan],

helped to positively transform large areas of Philadelphia, and emerged as a national leader and

authority on affordable housing issues." Am. Compl. ¶¶ 13-16.  At the time of this agreement,

Mr. Greene had lead PHA for over ten years and was widely known as a demanding boss who

expected, and achieved, results.

The Employment Agreement sets forth the terms and conditions of Mr. Greene's

employment, including salary, incentive compensation, benefits, and termination.  The contract

provides that Mr. Greene may be terminated for cause only under limited circumstances.  Cause

is defined *only* as:

> (1)  "A material act or acts of dishonesty on Mr. Greene's part, which is criminal in nature, intended to result directly or indirectly to Mr. Greene's substantial gain or personal enrichment at PHA's expense, and which results in demonstrable material injury and damage to PHA;"

> (2)  "Mr. Greene's willful and intentional conduct, recklessness, gross negligence and failure to substantially perform his duties [under the Agreement], other than a failure resulting from Mr. Greene's incapacity or illness, if Mr. Greene's willful and intentional misconduct, recklessness, gross negligence and failure results in demonstrable material injury and damage to PHA;" or

> (3) "Lack of funding."

Am. Compl. ¶¶ 17-20.

Despite the clear language of Mr. Greene's Employment Agreement, the Board

predicated its decision to suspend and subsequently terminate Mr. Greene on a series of

allegations reported in the newspapers, in television broadcasts, and on the radio.  The

allegations are threefold and wholly unrelated. Am. Compl. ¶¶ 22-23.  First, Mr. Greene was

sued by the bank holding a mortgage on his home because he failed to make timely payments.

This allegation first appeared in an August 13, 2010 *Daily News* article reporting that Wells

Fargo had started foreclosure proceedings against Mr. Greene. Am. Compl. ¶ 24. Second, Mr.

Greene was subject to federal tax liens, which have since been cured. This allegation appeared

in news stories published by both the *Daily News* and *The Philadelphia Inquirer* on August 14,

2010. Am. Compl. ¶ 25. Third, a number of former employees at PHA have reportedly made

sexual harassment claims directed at Mr. Greene. On August 18, 2010, the *Daily News* reported

that PHA employee Elizabeth Helm had filed a sexual harassment claim against Mr. Greene.

The following day, on August 19, 2010, *The Philadelphia Inquirer* ran a more detailed story

about Helm's allegations, this time citing salacious and outlandish statements by Helm's counsel,

John Elliott. Over the next few days, the press continued to capitalize on the story, publishing a

series of articles identifying three additional sexual harassment claims dating back to 2004, all of

which were settled by PHA's insurer. Am. Compl. ¶ 26.

   The first two allegations have no bearing on PHA or its operations. The third, while

related to PHA, constitutes claims affecting four disgruntled former employees out of thousands

of PHA workers. Even assuming these allegations could be proven true – which Mr. Greene has

consistently maintained they cannot – they cannot form the basis for terminating Mr. Greene.

Mr. Greene's Employment Agreement clearly states that termination can only be effectuated

upon wrongful acts that result in "demonstrable material injury and damage to PHA." The

allegations of sexual harassment have in no way caused "demonstrable material injury and

damage to PHA." Rather, those allegations were considered, addressed, and settled by PHA's

insurer with the benefit of counsel. Until the recent media circus, Mr. Greene continued to be

hailed as PHA's shrewd and capable leader. Am. Compl. ¶¶ 27-30.

   The PHA Board held a meeting on August 26, 2010 purportedly to address the media-

driven sexual harassment allegations against Mr. Greene. At this meeting, the Board adopted a

Resolution to place Mr. Greene on "administrative leave" pending the results of an "immediate, thorough and independent investigation" into the allegations of sexual harassment.  Am. Compl. ¶¶ 32-33.  The goal was to "complete the investigation and make recommendations for corrective action within 30 days."  The Resolution prohibited Mr. Greene from reporting to work, contacting or directing any PHA employees, or accessing any PHA systems during the pendency of the "investigation."  Am. Compl. ¶¶ 36-37.

The Board further resolved that Street was to be responsible for conducting the investigation and reporting its results to the Board.  At this meeting, Board members professed that the investigation would ensure that Mr. Greene would receive "due process" rather than be tried in the press.  Am. Compl. ¶¶ 38-39.  The Resolution states: "the Board has recently been made aware of certain serious allegations made against the Executive Director with respect to his professional conduct."  The Board claimed that it was "made aware" only after newspaper publications, television broadcasts, and radio reports of stories over a two-week period, all of which gave the Board and its chairman an opportunity to remove Mr. Greene from his post at PHA.  Am. Compl. ¶ 34.

By placing Mr. Greene on "administrative leave," the Board -- in effect -- terminated Mr. Greene without cause and in violation of the terms of his Employment Agreement.  This "investigation" and "administrative leave" period were pretext for Mr. Greene's termination.  On the day the Board suspended Mr. Greene, Street emailed *The Daily Finance* and wrote "His [Carl Greene's] tenure is clearly in jeopardy and his legacy threatened."  Reynolds too had already determined the allegations were true on the day of the suspension, telling the press that Mr. Greene "appeared to be a ladies man," noting that "[t]hey acted like he was the pope or Jesus,"

and concluding "I was amazed. How did he get away with it?" Am. Compl. ¶¶ 44-47. The results of this "investigation" appear to have been predetermined from its inception.

Mr. Greene instituted this lawsuit on September 7, 2010 in an attempt to protect his interests and his career from Street's increasingly uncontrolled and unchecked public attacks. This only spurred Street to make further and more outrageous public comments about Mr. Greene, revealing what appears to be Street's personal animus against Mr. Greene. Immediately after the initial Complaint was filed, Street called a press conference and accused Mr. Greene of engaging in a "full-blown cover-up" to hide settlements related to past sexual harassment claims from the Board. Street also reportedly told the media that two more women had complained about Mr. Greene, bringing the total number of complainants to eight. Street's accusation of a "cover-up" came a mere two weeks after the start of the Board's "investigation" and at least two weeks before any results were expected to be completed. Street had already decided, before the "investigation" was complete, that Mr. Greene would not return to his post as Executive Director of the PHA. Mr. Greene's attempts to protect his rights only made things worse. In fact, there were media reports that all items, to include furniture, personal belongings, files, papers, and records, were removed from Mr. Greene's office at PHA shortly after his suspension, which demonstrates that the Board never intended for Mr. Greene to remain as PHA's Executive Director. Am. Compl. ¶¶ 52-54.

On September 9, 2010, in the midst of Street's media-fueled attack on Mr. Greene, *The Philadelphia Inquirer* reported that Mr. Greene had caused Street's personal aide, Kafi Lindsay, to be investigated under suspicion that she had not appeared for work as required by PHA and HUD guidelines. The article also reported that it was highly unusual for a Board chairman, such as Street, to have his own personal aide and that other chairmen in and around Philadelphia did

not enjoy such privileges.  On September 12, 2010, *The Philadelphia Inquirer* recounted details of the investigation into Street's aide, including that her attendance at work was "sporadic," that she was "in violation of one or more PHA policies," and reported detailed surveillance of her whereabouts over a weeklong period that showed she was not in the PHA office during regular business hours.  Street claimed that he was unaware of the report or any investigation into Ms. Lindsay, despite a December 15, 2008 letter from Mr. Greene to Street warning him that Ms. Lindsay was being paid with federal funds and had to work on PHA matters during PHA office hours.  Am. Compl. ¶¶ 55-58.

About the same time news of Mr. Greene's investigation into Ms. Lindsay's whereabouts appeared in the newspapers, the media also reported that Ms. Lindsay was conducting the purported "investigation" into sexual harassment allegations against Mr. Greene at the direction of and in conjunction with Street.  This was the first Mr. Greene had heard regarding who was conducting the "investigation" on behalf of the PHA Board.  According to Street, the Board had intended to hire outside consultants and/or experts to conduct the "investigation," as PHA staffers were potential targets of the investigation.  But no such outsiders were ever involved. Rather, Street and his aide Ms. Lindsay – who Mr. Green had had investigated and who clearly had motive and opportunity to inflate the results of their efforts – conducted the "investigation." Am. Compl. ¶¶ 60-63.

Street's comments to the press about Mr. Greene became increasingly hostile after he learned that Mr. Greene had had Ms. Lindsay investigated, culminating in the public release of a scathing investigative report on the eve of a scheduled Board meeting.  This deliberate and calculated decision to release the report was part of a concerted effort by Street to ensure that news of the report appeared in the print and news media the same day as the Board meeting.  To

date, Mr. Greene has never been served with the results of the "investigation." His only notice of

the investigative report came from media stories and his only access to the report was the

Internet. The version of the report posted on the Internet is unattributed, unsigned, and undated.

Am. Compl. ¶¶ 65-67.

According to this report, Street determined that "based on the totality of the

circumstances surrounding Mr. Greene including but not limited to his personal financial

troubles; the four sexual harassment charges filed against him; the circumstances surrounding

their settlements and proposed settlements; the extreme and hostile work environment he created

and the unapproved abandonment of his duties combined constitute a violation of his

employment contract and warrant Carl Greene's immediate termination as Executive Director of

the Philadelphia Housing Authority."[1] The investigation report refers to Mr. Greene's "modus

operandi" to "target females and others whose identities we may never know," and labels Mr.

Greene "a true serial sexual harasser." Am. Compl. ¶¶ 68-69.

On September 23, 2010, the Board voted 4-1 to terminate Mr. Greene's position as

Executive Director of the PHA, presumably based on the biased, wildly inflated, and completely

one-sided claims in Street's investigation report. Tellingly, PHA Board Member Councilwoman

Jannie L. Blackwell voted against the termination resolution, saying that Mr. Green did not

receive due process throughout the course of the "investigation." Councilwoman Blackwell's

astute observation rings true. Mr. Greene was never given formal notice of the Board's actions,

was never asked to participate in this "investigation," and was never served with its results. It is

believed that Street presented this unfounded investigation report to the PHA Board during a

---

[1]    At no point during the course of the "investigation" did the Board or Street accuse Mr. Greene of
abandoning his duties as Executive Director of the PHA. This claim is completely unfounded and was part of a last-
ditch effort by Defendants to justify their wrongful termination of Mr. Greene.

closed-door session held shortly before the September 23, 2010 Board meeting.  Am. Compl. ¶¶ 70-74.

At the September 23, 2010 Board Meeting, Street made his most inappropriate and unprofessional statements yet, describing Mr. Greene as akin to "a great athlete with a drug problem" and calling Mr. Greene "the Tiger Woods of public housing."  These derogatory statements were nothing more than malicious attacks on Mr. Greene meant to amuse the press and provide sound-bites for newspaper and television reporters in attendance at the meeting. Am. Compl. ¶¶ 77-78.

In fact, is was only after Mr. Greene's counsel sent a letter to Mayor Michael Nutter, Philadelphia Controller Alan Butkovitz, the Philadelphia City Council, and the Philadelphia Delegation of the General Assembly – which was reported in the press – that Street sent Mr. Greene a letter titled "Written Notice of Termination Pursuant to ¶ 8(a) of Employment Agreement Dated March 29, 2007."  Am. Compl. ¶ 80.  Since Mr. Greene's official termination, the Board has yet to present Mr. Greene with any information about his termination, including his right to extend his medical benefits, redeem his accumulated vacation time, and related personnel matters.  Am. Compl. ¶ 82.  The callous and unwarranted withholding of Mr. Greene's earned vacation time and benefits reflects the Board's and in particular Street's maliciousness toward Mr. Greene.

Both before and after the Board's actions on September 23, 2010, Mr. Greene, through counsel, reached out the Mayor of Philadelphia, the City Council, and the state legislature to rein in the irresponsible actions of the Board's chairman, to no avail.  Am. Compl. ¶81.  Mr. Greene complained that the "investigation" followed no established procedures or guidelines; therefore, there was no grievance procedure of which Mr. Greene could avail himself.  Am. Compl. ¶ 64.

These pleas for help went unanswered. Therefore, in order to vindicate his rights and to obtain some form of redress against the outrageous actions of a former mayor and a passive board, Mr. Greene filed the instant action. The allegations in Mr. Greene's Complaint plead causes of action (1) pursuant to 42 U.S.C. § 1983 for denial of his right to due process as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution; (2) pursuant to state law for breach of contract by the PHA and its Board of Commissioners; (3) for defamation by Street; and (4) for false light invasion of privacy by Street.

## II.    LEGAL STANDARD FOR A MOTION TO DISMISS

In order to survive a motion to dismiss, a plaintiff is required to plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not "impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the alleged wrongdoing. *Id.* at 556. Even after *Twombly*, however, the standard remains that courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F. 3d 224, 233 (3d. Cir. 2008).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), the Court clarified the *Twombly* inquiry as two-pronged. First, the court should consider the sufficiency of the complaint, identifying the factual allegations that are to be accepted as true and those allegations that are legal conclusions and are not entitled to the assumption of truth. *Id.* Second, the court must consider whether the factual allegations plausibly suggest the plaintiff is entitled to relief. *Id.* To determine plausibility, the court should be "context-specific" and "draw on its judicial

experience and common sense." *Id.* A complaint may not be dismissed merely when it "strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

Moreover, in the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give a plaintiff the opportunity to amend his complaint. *Phillips*, 515 F.3d at 228. The Plaintiff need not specifically request leave to amend. As the *Phillips* court noted, "We have instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Id.* at 236 (internal citations omitted).

## III.   ARGUMENT

The PHA Board of Commissioners attempts to minimize its malicious and outright egregious conduct toward Mr. Greene, all of which arose amid a series of newspaper articles and unfounded allegations, as a simple employment decision. But this is a gross understatement of the chain of events that brought the parties before this Court. During the course of roughly one month, Street and the Board dismantled what took Mr. Greene twenty-five years to build as a public servant to the nation's most needy citizens. Mr. Greene's reputation and standing in the public housing community have been destroyed. Mr. Greene was terminated without due process of law, never having received notice of the charges or an opportunity to respond. During the course of that termination, the Defendants publicly humiliated and defamed Mr. Greene and ruined the reputation he worked so hard to build. The Defendants now ask the Court to dismiss Plaintiff's Complaint and permit them to hide behind the law, which is unacceptable. Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.[2]

---

[2]      Councilwoman Blackwell has separate counsel and has not joined in the remaining Board members' motion to dismiss. "Defendants" is used throughout this brief to refer to the parties bringing this motion to dismiss, namely Street, Brady, Eiding, and Reynolds. Moreover, "Complaint" is used throughout this brief to refer to Plaintiff's Amended Complaint.

### A.    Plaintiff's Complaint Adequately Alleges a Procedural Due Process Violation.

To state a claim for deprivation of procedural due process under 42 U.S.C. § 1983, Plaintiff must allege that he was deprived of life, liberty, or property and that the available procedures did not provide him due process of law. *See Hill v. Borough of Kutztown*, 445 F.3d 225, 233-34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Plaintiff's Complaint alleges sufficient facts to state a claim for deprivation of his property interest in his continued employment pursuant to the terms of his Employment Agreement and pursuant to the mutually explicit understanding between him and the PHA. The Complaint also alleges sufficient facts to state a claim for deprivation of Mr. Greene's liberty interest in his reputation because the Board, and in particular Street, defamed Mr. Greene during the course of his very public suspension and subsequent termination. Therefore, Defendants' motion to dismiss Count I of Plaintiff's Complaint should be denied.

### 1.    *Mr. Greene Had a Property Interest in His Continued Employment.*

Mr. Greene had a property interest in his continued employment with the PHA based on the language of his Employment Agreement and the Board's conduct throughout the course of his employment. While it is well-settled that a contract providing for termination only for cause can create a property interest in continued employment, it is not the only source of such a right. The property interests protected by procedural due process are not limited to those rights expressly created by statute or written contracts. Rather, the "property" that is safeguarded by the due process clause may be "created . . . by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Stana v. Sch. Dist. of the City of Pitts.*, 775 F.2d 122, 125 (3d Cir. 1985).

Property interests can come from "unwritten state or local government policies" or "mutually explicit understandings" between the government employer and the employee. *Id.* at 125 (citing *Perry v. Sinderman*, 408 U.S. 593, 601-02 (1972)). The plaintiff in *Stana* was a high school teacher who applied for a teaching position with the Pittsburgh School District. After completing the examination process and earning the required score, plaintiff's name was placed on an eligibility list from which teachers were to be selected as positions became available pursuant to the Public School Code. Although a position became available while plaintiff's name was at the top of the list, she later learned that another applicant with a lower score was awarded the position. Unbeknownst to plaintiff, a committee reevaluated her credentials and removed her name from the eligibility list based on a poor evaluation by her current boss. She received no notice of the committee's review, nor did she have an opportunity to explain the poor evaluation.

First, the court determined that plaintiff did not have a contract with the School District and that the Public School Code did not create a property right in her continued employment. Nevertheless, the court found that plaintiff had "a sufficient claim of entitlement" to her place on the eligibility list. *Id.* at 125. The court found that the School District had established a policy of placing teachers on the list, maintaining that list for a period of time, and selecting teachers from that list such that plaintiff and other applicants in her position had a "legitimate entitlement" to remain on the list. *Id.* at 126. Therefore, the School District could not remove plaintiff's name from the list without first affording her due process.

The *Stana* court relied heavily on the Supreme Court's opinion in *Perry v. Sinderman*, 408 U.S. 593 (1972). At issue in *Perry* was whether a college professor who lacked tenure had a property interest in continued employment with a state university. The plaintiff had been a

professor in the state college system for over ten years. He served in that position pursuant to an employment contract that was renewed each year. The college system did not have a formal tenure program, but the college fostered an understanding among the faculty that employment should be considered permanent as long as the faculty member's teaching was satisfactory and he or she was cooperative with his or her peers. According to the plaintiff, the college's course of conduct in renewing plaintiff's and others' contracts each year absent unsatisfactory performance created a *de facto* tenure program. Thus the Court held that allegations in plaintiff's complaint regarding "the existence of rules and understandings, promulgated and fostered by state officials, that may justify [a] legitimate claim of entitlement to continued employment absent 'sufficient cause'" was enough to make out a due process claim. *Id.* at 602-03.

There are several factors at issue here that created for Mr. Greene a legitimate claim of entitlement to continued employment absent cause as defined in his Employment Agreement. First, Mr. Greene's Employment Agreement contains a very narrow and specific termination-for-cause provision. The contract permits termination only in limited circumstances. Second, the Public Housing Authorities Law, 35 P.S. §1550 (gg), permits the PHA to enter into employment agreements that limit the Authority's power to terminate employment. Third, and most importantly, during the course of Mr. Greene's twelve-year employment with PHA, he developed an understanding of his right to continued employment absent cause as defined in the contract. This understanding was fostered by the Board's consistent renewal of Mr. Greene's employment agreements, their praise of his work, and their decision to continue Mr. Greene's employment despite knowledge of his allegedly "draconian" management style and past allegations of sexual harassment. The Board cannot now, in the face of public criticism, disavow

its relationship with Mr. Greene in an effort to save its own reputation. Mr. Greene was entitled to due process before becoming Street's and the Board's scapegoat.

The cases that Defendants cite in support of their motion to dismiss Plaintiff's due process claim are not dispositive. None of those cases involved contracts with succinct termination-for-cause provisions like that in Mr. Greene's Employment Agreement. Nor did any of those cases involve a twelve-year course of conduct by which the parties operated, or circumstances that created an understanding of continued employment that was at the center of the parties' relationship. *See, e.g.*, *Linan-Faye Constr. v. Hous. Auth. of Camden*, 49 F.3d 915 (3d Cir. 1995) (termination for convenience clause in construction contract; absence of for-cause provision); *Reich v. Beharry*, 883 F.2d 239 (3d Cir. 1989) (no employment contract; suit regarding payment within a specific time period); *Goodman v. Hasbrouck Heights Sch. Dist.*, 2007 U.S. Dist. LEXIS 45684 (D.N.J. June 20, 2007) (termination upon 60-days notice provision; no for-cause provision).

Defendants' argument is far too narrow, focusing solely on the literal language in the contract. *Perry* and *Stana* mandate a broader inquiry into the basis for Mr. Greene's property rights. Mr. Greene has alleged sufficient facts to demonstrate an understanding between the parties and a claim of entitlement to his continued employment. Therefore, Defendants' motion to dismiss Count I should be denied.

### 2.    *Mr. Greene Had a Liberty Interest in His Reputation.*

Mr. Greene also had a liberty interest in his reputation. He cannot be deprived of that interest without due process. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Hill*, 455 F.3d at 235 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437

14

(1971)).  To make out a due process claim for denial of a liberty interest in his reputation, a plaintiff must allege that the stigmatizing statements were made publicly and were false, and that he was deprived of a right or interest other than his reputation during the course of the government's making the stigmatizing statements.  Significantly, the plaintiff need not have a property interest in the right of which he is deprived.  *Id.* at 237.  This two-part inquiry is known as the "stigma-plus" test.  *Id.* at 236.  As the Third Circuit explained, "[t]he creation and dissemination of a false and defamatory impression is the 'stigma' and the termination is the 'plus.'"  *Id.*  A public employee is entitled to a name-clearing hearing before termination if the government insists on tarnishing his reputation during the course of that termination.  *Id.*

In *Hill*, the plaintiff sued the borough and the mayor for statements the mayor made that ultimately led to plaintiff's constructive termination as Borough Manager of Kutztown.  The plaintiff complained that the mayor publicly accused him of engaging in a "'plot' that was corrupt and criminal" and wrote a newspaper commentary accusing the plaintiff of "irregular or illegal" handling of borough funds and "reckless handling" of borough money.  *Id.* at 231.  The mayor also publicly vowed to "get rid of" plaintiff, and the mayor's attacks only intensified after the plaintiff complained about the mayor's behavior.  *Id.* at 230.  The ridicule and humiliation to which the mayor subjected plaintiff became unbearable, and he was forced to resign from his post as Borough Manager.  *Id.* at 231-32.  The plaintiff asserted deprivation of his right to procedural due process based upon, *inter alia*, his liberty interest in his reputation.  The court found that plaintiff's allegations recounting the mayor's accusations of illegal conduct to the general public, in the newspapers, and at borough council meetings were defamatory.  Those allegations, coupled with plaintiff's constructive termination, were sufficient to state a claim

under the stigma-plus test.  Therefore, the Third Circuit reversed the district court's decision to grant the mayor's motion to dismiss.

Mr. Greene's complaint undoubtedly sets forth allegations that demonstrate he was defamed during the course of his suspension and termination, all in violation of his right to procedural due process.  Street began labeling Mr. Greene as a "sexual harasser" shortly after his suspension; accused Mr. Greene of engaging in a "cover-up" to deceive the Board; claimed that Mr. Greene violated Board policy; and leaked a scathing, biased, and salacious investigation report to the press that identified Mr. Greene as a "true serial sexual harasser."  Street's attack also included allegations that Mr. Greene was akin to a drug addict and a sex addict.  Despite these very serious and slanderous allegations, Mr. Greene was never afforded a name-clearing hearing by the PHA.[3]  Mr. Greene is entitled to redress for this violation of his due process right.

### 3.    *Qualified Immunity does not Shield the Board from Liability for Plaintiff's Due Process Claim.*

The Board raises the defense of qualified immunity, stating that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity does not shield Defendants from liability in this case because the constitutional right to procedural due process stemming from an individual's property and liberty interests was clearly established at the time of the Board's actions leading up to and including Mr. Greene's suspension and termination.

Before the court can determine the issue of qualified immunity, it first must determine whether Mr. Greene has adequately alleged deprivation of a constitutional right.  *See Sokol v.*

---

[3]      While the word "liberty" admittedly does not appear in the Complaint, this can easily be cured by amendment should the Court deem it necessary.

16

*Reading Reg. Airport Auth.*, 2000 U.S. Dist. LEXIS 8735, * 25 (E.D. Pa. May 25, 2000). As

discussed above, Plaintiff has adequately alleged a deprivation of his due process rights to

property and liberty. Therefore, the central issue is whether reasonable officials in the Board's

position would have known that government employees have (1) a due process right to continued

employment based on contract language and an understanding between the parties and (2) a due

process right to a name-clearing hearing before the government can use stigmatizing statements

during the course of their termination.

> The Third Circuit has described the "reasonable official" inquiry as follows:

>> First, in order for the governing law to be sufficiently well
>> established for immunity to be denied, it is not necessary that there
>> have been a previous precedent directly in point. "'Some but not
>> precise factual correspondence' to precedent" is necessary for the
>> defendant to be charged with knowledge of the unlawfulness of his
>> or her actions. *Stoneking v. Bradford Area School District*, 882
>> F.2d 720, 726 (3d Cir. 1989) (quoting *People of Three Mile Island
>> v. Nuclear Regulatory Comm.*, 747 F.2d 139, 144 (3d Cir. 1984)).
>> The ultimate issue is whether, despite the absence of a case
>> applying established principles to the same facts, reasonable
>> officials in the defendants' position at the relevant time could have
>> believed, in light of what was in the decided case law, that their
>> conduct would be lawful. Second, even where the officials clearly
>> should have been aware of the governing legal principles, they are
>> nevertheless entitled to immunity if based on the information
>> available to them they could have believed their conduct would be
>> consistent with those principles.

*Good v. Dauphin Cty. Soc. Servs. for Child. & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). There

can be no qualified immunity in the face of clear and definite case law identifying the rights in

question; nor can there be qualified immunity in the absence of a reasonable belief that the

conduct was consistent with the principles underlying that right.

> Mr. Greene's due process rights were clearly established at the time the Board and Street

undertook their campaign to suspend and terminate him. The constitutional right at issue is that

of one's entitlement to due process of law before being deprived of "life, liberty, or property."

Due process is one of the most fundamental constitutional rights, and the Defendants would be

hard-pressed to argue that the Board was not aware that Mr. Greene had a due process right at

the time of his suspension and termination.  The Supreme Court determined as early as 1972 in

*Perry* that a property interest in one's employment can stem from sources other than written

contracts.  The Third Circuit recognized as early as 1985 in *Stana* that an employee with

renewable yearly contracts can have a legitimate claim of entitlement to continued employment.

And that one's liberty interest in his reputation requires a name-clearing hearing before

termination was clearly established by the Third Circuit in 1971 in *Hill*.  These Supreme Court

and Third Circuit opinions clearly defined the rights at issue long before Mr. Greene was an

employee of the PHA, and Defendants' unreasonable claims of ignorance as to their existence do

not warrant application of qualified immunity.

Moreover, there are specific facts that make the Board's claim of qualified immunity

particularly egregious.  The Board explicitly recognized Mr. Greene's right to due process at its

August 26, 2006 meeting during which it placed Mr. Greene on administrative leave.  Am.

Compl. ¶ 39.  Even more to the point, Councilwoman Blackwell has consistently maintained her

desire -- as a Board member -- to afford Mr. Greene due process, much to the chagrin of her

fellow Board members.  During the September 23, 2010 meeting during which the Board voted

to terminate Mr. Greene, Councilwoman Blackwell opposed the vote because Mr. Greene had

not been afforded due process during the Board's "investigation." Am. Compl. 72.  Thus, not

only would reasonable officials in the Board's position have been aware of Mr. Greene's due

process rights, but here the Board was *actually* aware of those rights and repeatedly reminded of

them by one of its own members.  Qualified immunity does not apply.

The Defendants also cite to a provision of the Housing Authorities law that it argues shields the Board from liability for Plaintiff's due process claim. But, "[s]tate law cannot immunize government employees from liability resulting from their violation of federal law." *Good*, 891 F.2d at 1091. In *Good*, the court refused to apply a provision of Pennsylvania's Child and Protective Services Law to shield two government employees from liability for an unconstitutional search of the plaintiff's home. *Id.* Here too, the provision of the Housing Authorities Law to which Defendants cite does not shield the Board from liability for violations of federal law.

### B.  Plaintiff's Complaint Adequately Alleges Breach of Contract.

Defendants' only argument in response to Plaintiff's breach of contract claim is that plaintiff sued the wrong party because he named only the PHA Board members, and not the PHA itself, as defendants. It is well-settled that a suit brought for conduct in one's official capacity is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 479 U.S. 159, 165-66 (1985).[4] The suit is considered one against the entity "[a]s long as the government entity receives notice and an opportunity to respond." *Id.* at 166.

Plaintiff's Employment Agreement was between him and the PHA. Street, acting on behalf of the PHA and in his capacity as Board chairman, signed the agreement. The PHA clearly is on notice of Plaintiff's breach of contract claim and has an opportunity to respond. Defendants' arguments are without merit and do not warrant dismissal of Mr. Greene's breach of contract claim.[5]

---

[4]      In fact, Defendants cite this very language in support of their claim for sovereign and/or governmental immunity. Apparently, Defendants choose only to recognize this proposition when they consider it beneficial to them.

[5]      In the event the Court determines that PHA should be a party, it is easily added by amendment.

**C.     Street is Not Immune from Plaintiff's Claims for Defamation and False Light Invasion of Privacy.**

Street's conduct was so egregious, malicious, and inappropriate that Mr. Greene was forced to amend his Complaint to include claims for defamation and false light invasion of privacy by Street individually.  Street asserts that he is entitled to absolute immunity from liability for these claims, but he enjoys no such protection.  Pennsylvania recognizes the doctrine of high public official immunity, which shields high public officials from liability for false and defamatory statements, provided that those statements are made "in the course of the official's duties or powers and within the scope of his authority."  *See Lindner v. Mollan*, 677 A.2d 1194, 1195 (Pa. 1996) (quoting *Matson v. Margiotti*, 88 A.2d 892, 895 (Pa. 1952)).  Here, it is not clear that Street is a "high public official" for immunity purposes, and even if the Court finds he is, the Complaint clearly includes allegations that Street acted well outside the course of his duties and outside the scope of his authority.

Whether a public officer qualifies as a high public official depends on "the nature of his duties, the importance of his office, and particularly whether or not he had policy-making functions."  *Id.* at 495 (quoting *Montgomery v. City of Phila.*, 140 A.2d 100, 105 (Pa. 1958)).  At issue in *Lindner* were statements made by a sitting mayor, who the Court recognized as a high public official for purposes absolute immunity.  The Court noted that high public official immunity has been extended to township supervisors, Attorneys General, District Attorneys, Assistant District Attorneys, a Commissioner of Public Property, a City Architect, a City Comptroller, and the Superintendent of the Board of Probation and Parole.  *See id.* at 497-98 (collecting cases).  To date, the Pennsylvania Supreme Court does not appear to have directly confronted the issue of whether members of the PHA Board of Commissioners are high public officials.

Street cannot be a public official solely by virtue of his former post as mayor of Philadelphia. While Plaintiff does not believe that Street's position as chairman of the PHA Board of Commissioners necessarily qualifies him as a high public official, whether or not he does so qualify is not dispositive because it is clear that his conduct and statements fall outside the scope of his official duties and authority.

That Street was operating outside the scope of any legitimate official authority is amply demonstrated through facts alleged in Mr. Greene's Complaint. For example, Street remained in regular email contact with members of the press during an ongoing "independent investigation;" he called impromptu press conferences during which he revealed unfounded allegations by "other women;" and he appeared on radio and television broadcasts commenting on everything from Mr. Greene to questioning the current mayor's racial identity. Most shocking, however, was Street's decision to leak the results of his "investigation" report to the press. The report was unsigned, unattributed, and undated. Finally, Street's statements likening Mr. Greene to a sex addict and a drug addict were not part of Street's duties as Board chairman. Only discovery will reveal the true extent of Street's conduct and statements, but Plaintiff's Complaint certainly includes a preview of what is to come. Therefore, Street is not entitled to high public official immunity.

The court reached a similar result in *Lamb Foundation v. North Wales Borough*, 2001 U.S. Dist. LEXIS 18797 (E.D. Pa. Nov. 16, 2001). Lamb Foundation ("Lamb") was a non-profit corporation that provided housing for the elderly and mentally and physically disabled, and Laura Mengel was its sole shareholder and director. Lamb and Mengel sued several borough officials for what they believed was a systematic effort to discriminate against and defame Lamb's disabled residents. The defamatory statements included this exclamation by the mayor

following a borough council vote: "Welcome to Mengelville folks, the ghetto of Upper Gwynedd." *Id.* at *13-14. The statement was reported in a local newspaper. The mayor, along with the other defendants, also published a letter to the public and the newspapers defaming the plaintiffs and claiming that disabled residents reported abuse in plaintiffs' living facilities. *Id.* at *14-15. Plaintiffs alleged that these statements were not made in the course of the mayor's duties or within the scope of his authority. The court had to accept plaintiffs' version of the facts as true, and held that whether the statements were made in the course of mayor's duties was "a question of fact for summary judgment or trial" that could not be determined on a motion to dismiss. *Id.* at 35.

The same was true in *Angelilli v. Borough of Conshohocken*, 1996 U.S. Dist. LEXIS 16994 (E.D. Pa. Nov. 15, 1996). There, the plaintiff was an administrative secretary who had a relationship with her direct supervisor. Plaintiff was later terminated because of what defendants considered to be her "immoral" relationship. One defendant publicly referred to plaintiff as a "home wrecker and a thief." Plaintiff sued for, *inter alia*, defamation. *Id.* at 2-4. The court assumed that the borough council member was a high public official for purposes of the motion to dismiss, but determined that the statement could have been made outside the scope of his duties given the context in which it was made. Moreover, the court determined that plaintiff's allegation that the council member "at all times relevant hereto served as a Council member of the Borough" did not "illuminate [the] issue" of whether the statement was made within the scope of defendant's duties. *Id.* at 21-22.

Finally, in *Biggans v. Foglietta*, 170 A.2d 345 (Pa. 1961), the Pennsylvania Supreme Court held that a city councilman was not immune from suit because his conduct fell outside the scope of his duties. There, plaintiff was chairman of a committee within the Philadelphia

Department of Licenses and Inspections.  Defendant was a city councilman who wrote a letter, on his official letterhead, to the mayor in which he defamed the plaintiff.  That letter was circulated through the local headquarters of the Republican party.  The Court determined that allegations in plaintiff's complaint that the letter was published "not on the floor of the City Council but 'through' a political headquarters" were enough to remove the defense of absolute privilege.  *Id.* at 346-47.

Here too, Mr. Greene's Complaint includes allegations that Street's conduct and statements far exceeded the scope of his authority and were not made pursuant to his duties as PHA Board chairman.  Therefore, based on Street's conduct and statements as alleged in the Complaint, he is not shielded from liability for Plaintiff's defamation claim by high public official immunity.

### D.   Plaintiff Adequately Pleads Defamation by Street.

To set forth a claim for defamation in Pennsylvania, a plaintiff must allege: "(1) the communication was defamatory; (2) publication by the defendant; (3) the communication applies to plaintiff; (4) the recipient of the communication understands the communication's defamatory meaning; (5) the recipient understands the communication to be intended to apply to plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion."  *See* 42 Pa.C.S. § 8343(a) (Purdon's 2010).  *See also Fanelle v. LoJack Corp.*, 79 F. Supp.2d 558, 561-562 (E.D. Pa. 2000).  The plaintiff need not prove special harm for statements that constitute defamation per se, which includes publications that "impute to another conduct, characteristics, or a condition that would adversely affect his or her lawful business trade."  *See Bakare v. Pinnacle Health Hosp., Inc.*, 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006) (citations omitted).

Mr. Greene has alleged that Street called him a "true serial sexual harasser;" equated him with a sex addict and a drug addict; and accused him of participating in a cover-up that included violating Board policies.  Mr. Greene has demonstrated that Street published these statements through various print and television media outlets and that Philadelphians understood the allegations to be defamatory.  The statements are *per se* defamatory, therefore harm is presumed. And, Mr. Greene has alleged that Street's conduct far exceeded the scope of his duties and authority as Board chairman.  Mr. Greene's Complaint clearly states a claim for defamation.

Street argues that Mr. Greene's defamation claim should be dismissed because he has not asserted that each and every statement upon which his claim is based was false.  As set forth above, Mr. Greene has adequately pleaded defamation and Defendants' hyper-technical reading of the Complaint is not a basis for dismissal.

Moreover, defamatory statements need not always be false.  Federal courts in this circuit have predicted that Pennsylvania would recognize defamation by implication, where the publication is literally accurate but when taken as a whole implies a message that is false.  *See Fanelle v. LoJack Corp.*, 2000 U.S. Dist. Lexis 17767, *7-12 (E.D. Pa. Dec. 7, 2000).  In *Fanelle*, the plaintiff had been arrested after police suspected him of running a "chop shop" for stolen cars.  Officers apprehended him from a location they learned of through the use of LoJack, an anti-theft devise that located stolen cars.  *The Philadelphia Inquirer* ran a story about the arrest that included references to the officers' use of LoJack to find the suspects.  The article also included a photograph of plaintiff, details of his arrest, multiple references to "thieves," and a description of his auto parts business.  LoJack used the article in promotional materials distributed in the tri-state area.  Plaintiff was tried and acquitted, but LoJack continued to use the news article and plaintiff sued for defamation.  The court recognized that the statements in

LoJack's promotional materials were literally true, but they implied a falsehood: that plaintiff was a car thief when he in fact had been acquitted. In these types of cases, the court held, the defense of truth requires the defendant to "establish the truthfulness of the *implication* arising out of the literally true facts." *Id.* at *18. Mr. Greene has consistently denied that he sexually harassed any PHA employees. Street's attempt to dismiss Plaintiff's defamation claim because his Complaint does not use the word "false" as much as Defendants would like does not warrant dismissal.

Street also argues that Plaintiff's claim for defamation should be dismissed because Mr. Greene, who is a public figure, has not pleaded that Street acted with actual malice. In the seminal case *New York Times v. Sullivan*, 376 U.S. 254, 282-83 (1964), the Supreme Court held that when public officials sue for defamatory statements critical of their official conduct, they must plead and prove actual malice on the part of the speaker. Actual malice requires "knowledge that [the statement] was false" or "reckless disregard of whether it was false or not." *Id.* at 279-70. This raises two issues, neither of which can be determined at the motion to dismiss stage. First, *Sullivan* only applies if Street was commenting on Mr. Greene's official conduct. Mr. Greene has alleged that the conduct at issue was private, and therefore was not subject to open debate and comment by Street. This is a factual dispute, and Mr. Greene's version of the facts must be accepted as true at this stage of the proceedings. Second, even if we assume that Street's comments were about Mr. Greene's official conduct, the Complaint includes allegations of actual malice. Namely, Street publicly labeled Mr. Greene a "sexual harasser" even before the results of his biased and unfounded investigation report; Street likened Mr. Greene to a sex addict and a drug addict, which is patently false; and Street accused Mr. Greene of a "cover-up" long before any purported investigation of the issue. Mr. Greene's Complaint is

replete with examples of Street's malicious and reckless conduct throughout the relevant time period.

### E.     Plaintiff Adequately Pleads False Light Invasion of Privacy by Street.

A claim for false light invasion of privacy arises when a defendant publicizes a matter that places plaintiff before the public in a false light if the false light "would be highly offensive to a reasonable person," and the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light" in which the plaintiff would be placed. *See Morgenstern v. Fox T.V. Stations of Phila.*, 2008 U.S. Dist. Lexis 92990, *29 (E.D. Pa. Oct. 31, 2008)(quoting RESTATEMENT (SECOND) OF TORTS § 652E (1977)). Moreover, "a false light claim can be established, even if the information released is true, if the information tends to imply falsehoods." *Id.* at *29-30 (citing *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. 1988)).

Mr. Greene's Complaint is replete with allegations that Street's comments regarding the past sexual harassment settlements placed him in a false light. In particular, Mr. Greene alleges that Street's comments imply that Mr. Greene somehow admitted that he sexually harassed the complainants by entering into settlements with them. That implication is untrue. These allegations are sufficient to allege false light invasion of privacy.

### F.     Sovereign and/or Governmental Immunity Do Not Bar Plaintiff's Claims.

Defendants argue that sovereign immunity and governmental immunity bar Plaintiff's claims for defamation and false light invasion of privacy against Street. Neither sovereign nor governmental immunity shields Street from liability.

Under 1 Pa. C.S. § 2310, "officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit"

except where there is a legislative waiver.  Conduct that is "willful and wanton[] is outside the scope of employment for purposes of Pennsylvania's sovereign immunity statute."  *See Estate of Smith v. Marasco*, 2006 U.S. Dist. LEXIS 58475, *14 (E.D. Pa. July 13, 2006).  Here, Plaintiff clearly alleges that Street's conduct falls outside the scope of his employment.  Therefore, sovereign immunity does not bar plaintiff's claims for defamation and false light invasion of privacy.  Further, 42 Pa. C.S. § 8541, which protects local agencies from liability for damages, does not apply here because Plaintiff is suing Street individually.[6]

## IV.   CONCLUSION

Plaintiff's Complaint adequately alleges claims for violation of his due process rights, breach of his Employment Agreement, defamation by Street, and false light invasion of privacy by Street.  Therefore, Plaintiff respectfully requests that Defendants' motion to dismiss be denied.

Respectfully Submitted,

CLIFFORD E. HAINES, ESQ. (PA ID 09882)
LAUREN A. CATES, ESQ. (PA ID 200620)
*Attorneys for Plaintiff*
Haines & Associates
1835 Market Street
Suite 2420
Philadelphia, Pennsylvania 19103
215-246-2200 Phone
Date:   November 12, 2010                 215-246-2211 Fax

---

[6]     Throughout Defendants' brief, they claim that Plaintiff has not sued the Board members, and Street in particular, individually.  Defendants argue that Plaintiff's allegations in ¶¶ 8-12 of his Amended Complaint indicate that this is solely a suit against the Board members in their official capacity.  But, that is not so.  Plaintiff has sued the Board members in both their official and individual capacities as evidenced by the identification of each Defendant individually in the caption and by reference to them "doing business as" the Board of Commissioners. Moreover, the factual allegations in Plaintiff's Complaint clearly allege conduct that falls outside the scope of the Defendants' official capacity.  To the extent that the Court deems Plaintiff's Complaint to be unclear in this respect, Plaintiff can amend to cure any potential source of confusion.  *Phillips*, 515 F.3d at 236 ("It does not matter whether or not a plaintiff seeks leave to amend.  We have instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.") (internal citations omitted).

## CERTIFICATE OF SERVICE

I, Lauren A. Cates, Esquire, hereby certify that on this 12th day of November 2010, I caused a true and correct copy of the foregoing Plaintiff's Brief in Opposition to Motion of Defendants John F. Street, Debra L. Brady, Patrick J. Eiding, and Nellie W. Reynolds to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6) to be served via the electronic filing system and first class mail upon the following:

Richard A. Sprague, Esquire
Joseph R. Podraza, Jr., Esquire
Thomas E. Groshens, Esquire
Sprague & Sprague
The Wellington Bldg., Suite 400
135 S. 19th Street
Philadelphia, PA 19103
Counsel for Defendants John F. Street, Debra L. Brady, Patrick J. Eiding, and Nellie W. Reynolds

Richard L. Scheff, Esquire
Stephen A. Madva, Esquire
Montgomery, McCracken, Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Counsel for Defendant Jannie L. Blackwell

LAUREN A. CATES